CARMEN MILAGROS RIVERA SANTANA y OTROS, demandantes y recurrentes, *v.* SUPERIOR PACKAGING INC. y OTROS, demandados y recurridos.

*Número:* RE-89-593 *Resuelto:* 9 de diciembre de 1992

118

*Alvaro R. Calderón, Jr.* y *Ariel O. Caro Pérez*, del *Bufete Alvaro R. Calderón, Jr.*, abogados de los recurrentes; *Leonardo Andrade Lugo* y *Jorge Segurola*, de *Goldman, Antonetti, Ferraiuoli, Axtmayer & Hertell*, abogados del recurrido Manuel Borrero; *Carlos C. Santiago*, de *Muñoz, Boneta, González, Arbona, Benítez & Peral*, abogado de la recurrida Steri-tech, Inc.; *Charles P. Adams*, de *Brown, Newsom & Córdova*, abogado en calidad de amicus curiae.

EL JUEZ ASOCIADO SEÑOR REBOLLO LÓPEZ emitió la opinión del Tribunal.

El 27 de febrero de 1987, Francisco Rivera Pastrana se encontraba trabajando en la planta farmacéutica propiedad de Squibb Manufacturing, Inc., en Humacao, Puerto Rico. El señor Rivera se desempeñaba como operador químico desde el año 1976 y, como parte de sus funciones, se le requería la preparación de soluciones químicas, que aplicara las mismas, que limpiara secadoras, áreas de trabajo y otro equipo y llevara a cabo cualquier otra labor que le asignara sus supervisores.

El día de los hechos que dan lugar al presente recurso al señor Rivera se le asignó la limpieza de una máquina se-

cadora y el área inmediata de la misma, incluyendo las paredes y el piso del cuarto donde se encontraba la misma.(¹) Para llevar a cabo la limpieza, se le entregó al señor Rivera una solución que contenía metanol e hidróxido de sodio. Además, al señor Rivera se le proveyó el equipo que necesitaba para llevar a cabo la limpieza, incluyendo zapatos de seguridad, guantes y un uniforme que cubría su cuerpo.

Mientras el señor Rivera estaba limpiando el cuarto, una chispa de estática produjo una explosión y un fuego súbito, el cual le ocasionó a éste graves quemaduras.(²) Eventualmente, el señor Rivera falleció, unos cuarenta y nueve (49) días después, debido a las complicaciones de las quemaduras. Posteriormente, los hijos y la compañera del señor Rivera radicaron una demanda en daños y perjuicios, ante el Tribunal Superior de Puerto Rico, Sala de Humacao, en contra de los oficiales y directores de la Squibb Manufacturing, Inc., alegándose negligencia de éstos en cuanto a las medidas de seguridad aplicadas, y contra varias corporaciones manufactureras y distribuidoras de productos que alegadamente contribuyeron a la explosión, al fuego y a los daños sufridos por el occiso.

Una vez entablado el pleito, la mayoría de los codemandados presentaron, entre otras, sendas mociones de desestimación y de sentencia sumaria. El tribunal de instancia, con el fin de facilitar la economía y ligereza del proceso, procedió a considerar los escritos sometidos por cada uno de los codemandados, y mediante Resolución de 28 de sep-

---

(¹) El señor Rivera estaba compartiendo las labores de limpieza con el empleado Gabriel Soto Machuca. El propósito de limpiar al área de la secadora era cambiar el código del producto de acuerdo con los requisitos de la compañía para que un nuevo producto pudiera ser procesado en la secadora. (Segunda Demanda Enmendada, pág. 4.) Solicitud de revisión, *exhibit* XV, pág. 4.

(²) El Sr. Gabriel Soto Machuca no se encontraba en esos momentos en el cuarto de la secadora debido a que fue a buscar su respirador para así protegerse de los gases que emanaban del referido cuarto. (Segunda Demanda Enmendada, pág. 5.) Solicitud de revisión, *exhibit* XV, pág. 5.

tiembre de 1989 resolvió las mismas. En lo que respecta al recurso del epígrafe, el foro de instancia declaró con lugar la moción de sentencia sumaria parcial radicada por la codemandada Steri-tech, Inc. y el codemandado Manuel Borrero, respectivamente. De esa sentencia parcial final, recurrió ante nos la parte demandante mediante el correspondiente escrito de revisión.

En cuanto al codemandado Steri-tech, Inc., los recurrentes alegan que erró el tribunal al dictar sentencia sumaria por cuanto existía controversia real sobre hechos materiales y al desatender una moción de prórroga que éste había radicado para oponerse a la solicitud de sentencia sumaria. Igualmente, señala el recurrente que erró el tribunal al dictar sentencia sumaria parcial desestimando la demanda contra Manuel Borrero, Presidente de Squibb Manufacturers, Inc., al resolver que éste no es el tercero que puede ser responsable al obrero bajo la Ley de Compensaciones por Accidentes del Trabajo.

Examinado el recurso de revisión, le concedimos término a la codemandada Steri-tech, Inc. para mostrar causa por la cual no debíamos expedir el auto solicitado y revocar la sentencia recurrida "por razón de que en relación a la reclamación contra dicha parte codemandada existe controversia sobre hechos esenciales que deben ser dilucidados en un juicio plenario ...". Resolución de 14 de diciembre de 1989. Igualmente, le concedimos término al codemandado Manuel Borrero para mostrar causa por la cual no debíamos expedir el auto y revocar la sentencia recurrida "en vista de lo resuelto en el caso de *López Rodríguez v. Delama*, 102 D.P.R. 254 (1974)". Íd.

Habiendo comparecido la codemandada Steri-tech, Inc. y el codemandado Manuel Borrero en cumplimiento de la referida resolución y estando en condiciones de resolver el recurso, procedemos a así hacerlo.

# I

El 12 de julio de 1989, la codemandada Steri-tech, Inc., presentó moción para que se dictara sentencia sumariamente. Conforme a las disposiciones de la Regla 8.4 de Procedimiento Civil de 1979 (32 L.P.R.A. Ap. III), la demandante recurrente tenía diez (10) días, desde la notificación de la moción, para oponerse a la misma. A tenor con dicha Regla 8.4, la demandante, con fecha de 21 de julio de 1989, solicitó al tribunal una prórroga de treinta (30) días para oponerse a la moción de sentencia sumaria. Por alguna razón, la referida moción de prórroga no llegó a conocimiento del tribunal y, por ende, éste nunca la resolvió. Por otro lado, la parte demandante no realizó gestión adicional alguna con respecto al *status* de su moción de prórroga. El tribunal, con fecha de 28 de septiembre de 1989, dictó sentencia sumaria parcial desestimando el caso,[3] basándose en el hecho de que la parte demandante "no ha contestado la solicitud de sentencia sumaria, *ni ha solicitado prórroga para hacerlo*". (Énfasis suplido.)

La parte demandante presentó moción de reconsideración el 13 de octubre de 1989, acompañando copia de una moción en oposición a la sentencia sumaria. Es en dicha moción de reconsideración que, por primera vez, el recurrente le señala al tribunal de instancia que había solicitado una prórroga para oponerse a la moción de sentencia sumaria y, en adición, le explica al tribunal las dificultades acaecidas para oponerse a la misma. En síntesis, argumentó que intentó conseguir una declaración jurada de uno de sus peritos, el Dr. Edwin Smith, quien residía en el estado de Ohio; que debido a razones desconocidas, nunca recibió la declaración jurada, por lo que tuvo que procurar una segunda que le fue enviada el 30 de septiembre de

---

[3] La referida sentencia fue archivada en autos con fecha 10 de octubre de 1989.

124

1989. El tribunal de instancia declaró sin lugar la moción de reconsideración.

■ Comenzamos reiterando que "[a]l interpretar las Reglas de Procedimiento Civil hay que tener presente, como principio rector, que éstas no tienen vida propia, sólo existen para viabilizar la consecución del derecho sustantivo de las partes. Para lograr impartir justicia al resolver los reclamos de las partes, el tribunal debe hacer un balance equitativo entre los intereses en conflicto ejerciendo especial cuidado al interpretar las reglas procesales para que éstas garanticen una solución justa, rápida y económica de la controversia". (Énfasis en el original suprimido.) *Dávila v. Hosp. San Miguel, Inc.*, 117 D.P.R. 807, 816 (1986). Hemos resuelto, adicionalmente, que existe una política judicial de que los casos se ventilen en sus méritos. *Lluch v. España Service Sta.*, 117 D.P.R. 729 (1986); *Garriga Gordils v. Maldonado Colón*, 109 D.P.R. 817 (1980); *Coll v. Picó*, 82 D.P.R. 27 (1960).

■ En lo concerniente al caso de autos, el tribunal aparentemente no estaba consciente de la radicación de la moción de prórroga y de las gestiones que estaba llevando a cabo la demandante para obtener la declaración jurada de su perito. Sin embargo, una vez advino en conocimiento de estos hechos, a través de la moción de reconsideración, el tribunal en el ejercicio de su discreción y en vista del importante interés de que todo litigante tenga su día en corte y que la parte no sea perjudicada por los actos y omisiones de su abogado, debió haber reconsiderado su sentencia y considerar la moción en oposición a sentencia sumaria. *Núñez González v. Jiménez Miranda*, 122 D.P.R. 134 (1988); *Dávila v. Hosp. San Miguel, Inc.*, ante; *Garriga Gordils v. Maldonado Colón*, ante. *Dicho escrito, como expondremos a continuación, demuestra que existe controversia de hechos que debe ser dilucidada en un juicio plenario.*

La codemandada Steri-tech, Inc. es una corporación do-

méstica, debidamente organizada y existente en virtud de las leyes del Estado Libre Asociado de Puerto Rico; la misma es una suplidora y manufacturera de "mamelucos o cubiertas" para poner sobre la ropa (*coveralls*). La parte demandante sostiene que Steri-tech, Inc. "es responsable por cuanto le proveyó al laboratorio químico de la Squibb un mameluco o cubierta, inherentemente peligrosa, que, al incendiarse con la explosión, se adhirió al cuerpo de Rivera agravándole las quemaduras y causándole la muerte". (Segunda Demanda Enmendada, pág. 7.) Solicitud de revisión, *exhibit* XV, pág. 7. Dicha alegación de la parte demandante se fundamenta en la responsabilidad absoluta del fabricante o manufacturero por los daños causados por sus productos defectuosos.

Respondiendo a las necesidades sociales de Puerto Rico, por vía judicial y como cuestión de política pública, establecimos y adoptamos en nuestra jurisdicción la norma de responsabilidad absoluta del fabricante de productos defectuosos.[4] *Mendoza v. Cervecería Corona, Inc.*, 97 D.P.R. 499 (1969); *Montero Saldaña v. Amer. Motors Corp.*, 107 D.P.R. 452 (1978). En ambos casos citamos con aprobación la norma de responsabilidad absoluta extracontractual (*strict liability in torts*), vertida por el Tribunal Supremo de California en el caso de *Greenman v. Yuba Power Products, Inc.*, 377 P.2d 897, 900 (Cal. 1962). El Juez Presidente Traynor expresó así la norma: "[u]n fa-

---

[4] Para llenar una laguna de nuestro ordenamiento jurídico, adoptamos por vía jurisprudencial los principios legales elaborados en el derecho común norteamericano de *products liability. Mendoza v. Cervecería Corona*, 97 D.P.R. 499 (1969). Nuestra tarea a través de los años se ha circunscrito a desarrollar esta área del derecho caso a caso, no obstante el hecho de que nuestro derecho patrio está arraigado al sistema del Derecho Civil, donde predomina la norma positiva o escrita. Por tal razón, entendemos que es menester de la Asamblea Legislativa recopilar, incorporar, adoptar, desarrollar un derecho propio de *products liability*. En Francia, por ejemplo, se está tratando de enmendar el Código Civil francés para incorporar las normas generales que rigen el campo de la responsabilidad absoluta del fabricante de productos defectuosos. Sin embargo, mientras la Legislatura no actúe, seguiremos desarrollando dicho campo caso a caso.

bricante o manufacturero responde absolutamente en daños y perjuicios cuando un artículo que pone en el mercado, a sabiendas de que va a ser usado sin una inspección de defectos, evidencia un defecto que ocasiona daños a un ser humano [y que] la responsabilidad no es una regida por la ley de garantías contractuales sino por la ley de responsabilidad absoluta en daños y perjuicios." (Traducción nuestra.) La razón de política pública detrás de la norma, nos ilustra la decisión de *Greenman v. Yuba Power Products, Inc.*, ante, pág. 901, es que "[e]l propósito de tal responsabilidad es asegurar que el costo de los daños resultantes de los productos defectuosos sean sufragados por los fabricantes que enviaron tales productos al mercado en vez de las personas damnificadas que están impotentes para protegerse ellos mismos". (Traducción nuestra.)

En resumen, la parte demandante tiene que establecer en un caso de esta naturaleza, en primer lugar, *la existencia del defecto en el producto* y, en segundo término, que *dicho defecto fue la causa legal de los daños o lesiones sufridas por ella.*[5] Así pues, bajo la norma de responsabilidad absoluta que en este tipo de casos rige en nuestro ordenamiento, el perjudicado no tiene que probar la negligencia del fabricante, ni del vendedor, *pero sí tiene que probar que el producto era defectuoso.* W.P. Keeton, *Prosser and Keeton on Torts*, 5ta ed., Minnesota, Ed. West Publishing Co., 1984, Sec. 99, págs. 694–695; H. Brau del Toro, *Los daños y perjuicios extracontractuales en Puerto Rico*, 2da ed., San Juan, Pubs. J.T.S., 1986, págs. 896–897. Cabe señalar, sin embargo, "que si bien el consumidor no tiene

---

[5] Cabe señalar que estos dos (2) requisitos quedan comprendidos entre los pautados por nuestro Art. 1802 del Código Civil, 31 L.P.R.A. sec. 5141. En España se ha reconocido que la responsabilidad civil del fabricante podrá albergarse siempre en los términos generales de este articulado. Ángel Rojo y Fernández-Río, *La Responsabilidad Civil del Fabricante*, Zaragoza, Cometa, 1974, pág. 125. Se observa que por razones de política pública la teoría de responsabilidad absoluta del fabricante omite el requisito de establecer la negligencia del demandado.

que establecer directamente la negligencia del fabricante, el fabricante no es asegurador de todos los daños que puedan ocasionar sus productos". *Mendoza v. Cervecería Corona, Inc.*, ante, pág. 512.(⁶)

En *Greenman v. Yuba Power Products, Inc.*, ante, se señaló que "el fabricante o vendedor era responsable por los defectos de diseño y fabricación del cual el lesionado no tiene conocimiento, que hace que el producto sea inseguro para el uso para el cual fue destinado [o para el uso para el cual se fabrica o se vende]". Posteriormente, en el caso de *Cronin v. J.B.E. Olson Corporation*, 501 P.2d 1153 (Cal. 1972), el Tribunal Supremo de California expresó que no se le impondrá responsabilidad absoluta (*strict liability*) a un manufacturero o vendedor cuando las lesiones sufridas por la víctima provienen de un uso del producto que no es razonablemente previsible para el fabricante. En consecuencia, se modificó la norma de *Greenman v. Yuba Power Products, Inc.*, ante, al eliminar la frase "un uso para el cual fue destinado". En fin, señala el caso de *Cronin v. J.B.E. Olson Corporation*, ante, que el fabricante o vendedor es responsable por los defectos de su producto, siempre y cuando el lesionado lo utilice para un uso que sea razonablemente previsible para el fabricante. *Cronin v. J.B.E. Olson Corporation*, ante; *Barker v. Lull Engineering Co., Inc.*, 573 P.2d 443 (Cal. 1978); Brau del Toro, *op. cit.*, págs. 901–902.

_____

(⁶) El defecto de que adolece el producto no tiene que ser uno irrazonablemente peligroso al consumidor o comprador como dispone la Sec. 402(A) de 4 *Restatement Of the Law (Second) of Torts* Sec. 402A (1966). *Montero Saldaña v. Amer. Motors Corp.*, 107 D.P.R. 452, 461 (1978). En dicho caso, nos basamos en la decisión del Tribunal Supremo de California en *Cronin v. J.B.E. Olson Corporation*, 501 P.2d 1153 (Cal. 1972) y *Barker v. Lull Engineering Co., Inc.*, 573 P.2d 443 (Cal. 1978), los cuales rechazaron "el concepto de la 'condición irrazonablemente peligrosa al consumidor' consignada en el Restatement, [ya que] para aplicar la doctrina de responsabilidad absoluta basta ajustarse a lo expuesto en el caso de Greenman antes transcrito ya que provee 'una prueba clara y sencilla para determinar si el demandante lesionado tiene derecho a un resarcimiento' ". (Énfasis en el original suprimido.) *Montero Saldaña v. Amer. Motors Corp.*, ante, pág. 462.

■ En el campo de *product liability* existen tres (3) tipos de defectos que dan margen a la aplicación de la doctrina de responsabilidad absoluta; eston son: defectos de fabricación, defectos de diseño y defectos por insuficiencia en las advertencias o instrucciones. *Anderson v. Owens-Corning Fiberglas Corp.*, 281 Cal. Reptr. 528 (1991); *Cavers v. Cushman Motor Sales, Inc.*, 157 Cal. Reptr. 142 (1979); *Barker v. Lull Engineering Co., Inc.*, ante; *Cronin v. J.B.E. Olson Corporation*, ante; *Canifax v. Hercules Powder Co.*, 4 Cal. Reptr. 552 (1965); *Greenman v. Yuba Power Products, Inc.*, ante; Keeton, *op. cit.*, pág. 695; *Montero Saldaña v. Amer. Motors Corp.*, ante; Brau del Toro, *op. cit.*, pág. 901.

■ En cuanto a los defectos de fabricación, este Tribunal adoptó la definición de "defecto" sugerida por el entonces Juez Presidente Traynor, en el citado caso de *Greeman v. Yuba Power Products, Inc.*, ante, a los efectos de que "un producto defectuoso puede ser definido como aquel que falla en igualar la calidad promedio de productos similares, y el manufacturero es entonces responsable por los daños resultantes de las desviaciones de la norma". *Mendoza v. Cervecería Corona, Inc.*, ante, pág. 512 esc. 7; *Montero Saldaña v. Amer. Motors Corp.*, ante, pág. 462; R.J. Traynor, *The Ways and Meanings of Defective Products and Strict Liability*, 32 Tenn. L. Rev. 363, 367 (1965). En *Barker v. Lull Engineering, Co. Inc.*, ante, el Tribunal Supremo de California limitó la norma propuesta por el Juez Traynor a los casos de defectos de fabricación.[7]

---

[7] A esos efectos expresó el Tribunal a la pág. 454:

"In general, a manufacturing or production defect is readily identifiable because a defective product is one that differs from the manufacturer's intended result or from other ostensibly identical units of the same product line. For example, when a product comes off the assembly line in a substandard condition it has incurred a manufacturing defect. (*E. g., Lewis v. American Hoist & Derrick Co.* (1971) 20 Cal.App.3d 570, 580, 97 Cal.Rptr. 798.) A design defect, by contrast, cannot be identified simply by comparing the injury—producing product with the manufacturer's plans or with other units of the same product line, since by definition the plans and

■ Para determinar si hay un defecto de diseño, el Tribunal Supremo de California elaboró un análisis, o *test*, de dos (2) alternativas.([8]) Así pues, el demandante prevalecerá en un caso de defecto de diseño si demuestra que: "(1) el producto falló en comportarse en forma tan segura como un usuario ordinario habría esperado al usar el producto para el uso para el cual fue destinado o para el cual previsiblemente podría ser usado, o si demuestra que, (2) ... el diseño del producto fue la causa próxima de los daños y el demandado no probó que en el balance de intereses, los beneficios del diseño en cuestión sobrepasan los riesgos de peligro inherentes en el diseño." (Traducción nuestra.) *Barker v. Lull Engineering Co., Inc.*, ante, pág. 446. Bajo esta segunda alternativa, se traslada al fabricante la carga de la prueba de que los beneficios del diseño utilizado sobrepasan los riesgos inherentes al mismo. Íd.([9])

■ En tercer lugar, aunque un producto no adolezca

---

all such units will reflect the same design. Rather than applying any sort of deviation-from-the-norm test in determining whether a product is defective in design for strict liability purposes, our cases have employed two alternative criteria in ascertaining, in Justice Traynor's words, whether there is something 'wrong, if not in the manufacturer's manner of production, at least in his product'. (Traynor, *The Ways and Meanings of Defective Products and Strict Liability*, supra, 32 Tenn.L.Rev. 363, 366)."

([8]) La regla del caso *Barker v. Lull Engineering. Co., Inc.*, ante, combina parte del *consumer expectation test* y del *risk/utility or benefits test*. Véanse: W.P. Keeton, *Prosser and Keeton on Torts*, 5ta ed., Minnesota, Ed. West Publishing Co., 1984, pág. 702; M. Stuart Madden, *Products Liability*, 2da ed., St. Paul, Minn., Ed. West Publishing Co., 1988, Vol. I, pág. 220.

([9]) En *Barker v. Lull Engineering Co., Inc.*, ante, pág. 455, el Tribunal Supremo de California expresó así la norma:

"...a product is defective in design either (1) if the product has failed to perform as safely as an ordinary consumer would expect when used in an intended or reasonably foreseeable manner, or (2) if, in light of the relevant factors discussed below, the benefits of the challenged design do not outweigh the risk of danger inherent in such design."

Entre los criterios relevantes a considerar en la segunda alternativa se señalaron los siguientes:

"...the gravity of the danger posed by the challenged design, the likelihood that such danger would occur, the mechanical feasibility of a safer alternative design, the financial cost of an improved design, and the adverse consequences to the product and to the consumer that would result from an alternative design." *Barker v. Lull Engineering Co., Inc.*, ante, pág. 455.

de defectos de fabricación o de diseño, el mismo es considerado defectuoso si el fabricante o vendedor no le ofrece al usuario o consumidor aquellas advertencias o instrucciones que sean adecuadas en torno a los peligros o riesgos inherentes en el manejo o uso del producto. Dicho deber se extiende a todos los usos del producto que sean razonablemente previsibles para el fabricante. La omisión de no dar las advertencias expone al fabricante a responsabilidad, si éste sabía, o debió haber sabido del peligro o riesgo envuelto, y la necesidad de dar la advertencia para garantizar el uso más seguro del producto. *Anderson v. Owens-Corning Fiberglas Corp.*, ante; *Rosburg v. Minnesota Min. & Mfg. Co.*, 226 Cal. Reptr. 299 (1986); *De-León v. Commercial Mfg. and Supply Co.*, 195 Cal. Reptr. 867 (1983); *Groll v. Shell Oil Co.*, 196 Cal. Reptr. 52 (1983); *Cavers v. Cushman Motor Sales, Inc.*, ante; 3 *Am. Law Prod. Liab. 3d* Sec. 32 (1987); Stuart Madden, *op. cit.*, Cap. 10.

En el caso de autos, el "mameluco" (*coverall*) que tenía puesto el occiso el día del accidente está compuesto de un material llamado "Tyvek", el cual es una marca registrada de Dupont. Según Steri-tech, Inc., el proceso de manufactura de los "mamelucos" consiste en cortar el Tyvek de acuerdo con patrones de diferentes tamaños y luego coser los cortes de dicho material.[10] De la declaración jurada, y los documentos que se acompañan con la moción de sentencia sumaria, Steri-tech, Inc. sostiene que se desprende de la literatura técnica de Tyvek que no hay controversia real sustancial sobre el hecho de que el material Tyvek no es defectuoso ni inherentemente peligroso al usuario. A esos efectos señala que dicho material cumple con todos los códigos y leyes federales en cuanto a flamabilidad se requiere, y a los requisitos establecidos para ropa de uso general (*general wearing apparel*) del *Federal Flammable*

---

[10] Moción de sentencia sumaria, págs. 1–2. Solicitud de revisión, *exhibit* II, págs. 1–2.

*Fabrics Act.*([11]) Arguye, además, que el mameluco Tyvek se utiliza como indumentaria de uso limitado para funciones industriales y médicas, como por ejemplo, ser barrera de materia particulada para mantener limpio el ambiente en determinados salones (*clean rooms*), para proteger a los trabajadores de los peligros de partículas de asbestos y para el empaque de productos médicos estériles.([12]) Señala en adición la codemandada, que dichos mamelucos no se fabrican ni se venden para ser usados como equipo de seguridad contra fuegos, ni para ser usados en sitios en los cuales haya un riesgo previsible de incendio.([13])

En primer lugar, hay que señalar que el *Federal Flammable Fabrics Act* no provee una causa de acción privada a las víctimas por los daños resultantes de quemaduras sufridas debido a la inflamabilidad de la ropa o indumentaria.([14]) Igualmente, dicho estatuto no necesariamente impide que indumentarias inflamables sean puestas en el comercio. Por otro lado, los estados tampoco están limitados a aplicar solamente las disposiciones criminales y los estándares reglamentarios del estatuto federal a aquellos casos civiles que traten de la inflamabilidad de la indumentaria o tejido (*fabrics*). Por el contrario, los estados pueden imponerle responsabilidad bajo sus leyes de *products liability* a los fabricantes o vendedores, aunque éstos cumplan con los estándares mínimos del estatuto federal. Véanse: *Raymond v. Riegel Textile Corporation.*, 484 F.2d 1025 (1er Cir. 1973); *Simien v. S. S. Kresge Co.*,

---

([11]) Moción de sentencia sumaria, pág. 2. Solicitud de revisión, *exhibit* II, pág. 2.

([12]) Véase Declaración Jurada del presidente de Steri-tech, Sr. Jorge Vivoni, pág. 2. Solicitud de revisión, *exhibit* II, pág. 29.

([13]) Solicitud de revisión, *exhibit* II, pág. 2.

([14]) El *Federal Flammable Fabrics Act*, prohíbe la introducción de tejidos inflamables (*fabrics*) en el comercio interestatal, los cuales no cumplen o satisfacen los estándares de inflamabilidad establecidos por el *Consumer Products Safety Commission*; dichas transacciones prohibidas constituyen un método de competencia desleal e igualmente constituyen prácticas ilícitas conforme el *Federal Trade Commission Act*, 15 U.S.C. sec. 41 *et seq.*

566 F.2d 551 (5to Cir. 1978); *Feiner v. Calvin Klein, LTD.,* 549 N.Y.S.2d 692 (1990); *Am. Law Prod. Liab. 3d,* ante, Vol. 6, Sec. 87:2; Nota, *Products Liability: Flammable Clothing,* 1 A.L.R.4th 251 (1980); 63 *Am Juris 2d Products Liability,* Sec. 96 (1984).

Por su parte, la recurrente alega que existe controversia real sobre el hecho material de la peligrosidad del producto "Tyvek". En apoyo a la moción en oposición a la sentencia sumaria, la parte demandante presentó una declaración jurada del Dr. Edwin E. Smith, profesor de ingeniería química de la Universidad de Ohio, en la cual discute las características de flamabilidad del material "Tyvek". Según la declaración jurada del señor Smith, "el material 'Tyvek' es el nombre de marca dado a un material tejido de polietileno, que se enciende rápidamente cuando es expuesto a una fuente de ignición grande. [*Este material, añade el perito,] tiene una característica que lo hace muy peligroso al usarse como indumentaria en situaciones propensas a fuegos, la cual es, su tendencia a quemarse y derretirse en gotas líquidas.* ... Estas gotas líquidas de material derretido causan quemaduras serias al adherirse al cuerpo de la persona quemada causando así peores quemaduras y agravando las condiciones de la persona que está expuesta al fuego".([15]) (Traducción nuestra.) Solicitud de revisión, *exhibit* VI, pág. 2.

Como es sabido, la Regla 36.3 de las de Procedimiento Civil, 32 L.P.R.A. Ap. III, dispone que se dictará sentencia sumaria "inmediatamente si las alegaciones, ... [deposiciones], contestaciones a interrogatorios y admisiones ofrecidas, en unión a las declaraciones juradas, si las hubiere, demostraren que no hay controversia real sustancial en cuanto a ningún hecho material y que como cuestión de derecho debe dictarse sentencia sumaria a favor de

---

([15]) Véase Declaración Jurada del perito Dr. Edwin E. Smith.

la parte promovente". El propósito cardinal de esta regla es el de promover una solución justa, rápida y económica del litigio abreviando la disposición de pleitos que por no envolver una controversia genuina de hechos materiales hace innecesaria la celebración del juicio en su fondo. Usada con sabio discernimiento resulta ser un mecanismo valioso para descongestionar los calendarios judiciales. *Padín v. Rossi*, 100 D.P.R. 259, 263 (1971); *Roth v. Lugo*, 87 D.P.R. 386, 392 (1963); J.A. Cuevas Segarra, *Práctica Procesal Puertorriqueña: Procedimiento Civil*, San Juan, Pubs. J.T.S., 1985, Vol. II, Cap. V, pág. 182.

 Ahora bien, la parte que solicita la sentencia sumaria en un pleito está en la obligación de demostrar, fuera de toda duda, la inexistencia de una controversia real sobre todo hecho pertinente que a la luz del derecho sustantivo determinaría una sentencia a su favor como cuestión de ley. *Tello, Rivera v. Eastern Airlines*, 119 D.P.R. 83, 86 (1987); *Roth v. Lugo*, ante, pág. 397.

 Para derrotar una solicitud de sentencia sumaria la parte opositora debe presentar, como regla general, contradeclaraciones juradas y contradocumentos que pongan en controversia los hechos presentados por el promovente. Si se cruza de brazos corre el riesgo de que le dicten sentencia en su contra sin la declaración del juicio en su fondo. *Flores v. Municipio de Caguas*, 114 D.P.R. 521 (1983). La sentencia sumaria sólo debe dictarse en casos claros, *Roth v. Lugo*, ante, y cualquier duda debe resolverse en contra de la parte que solicita la sentencia. *Valcourt Questell v. Tribunal Superior*, 89 D.P.R. 827, 832 (1964); *Corp. Presiding Bishop CJC of LDS v. Purcell*, 117 D.P.R. 714 (1986).

Luego de un cuidadoso estudio y análisis de los documentos y declaraciones juradas obrantes en autos, de la forma más favorable al demandante, coincidimos en que el récord refleja que el tribunal no tuvo ante sí, al resolver la

moción de sentencia sumaria, todos los hechos esenciales. En el caso ante nos, existe controversia de hechos acerca de si el material "Tyvek" es defectuoso o no. La parte demandante, mediante testimonio pericial, ha ofrecido prueba tendente a demostrar que la característica de inflamabilidad del producto "Tyvek", esto es, su tendencia a derretirse en gotas líquidas y adherirse al cuerpo, hacen que el producto pueda ser considerado inherentemente peligroso o defectuoso.(16)

Por otro lado, aunque un producto no tenga defectos de fabricación o diseño, el mismo puede ser considerado defectuoso por falta de dar las advertencias o instrucciones acerca de los peligros inherentes en el uso o manejo del producto. De manera pues, que aun cuando el juzgador de los hechos determine que el producto no contiene ningún defecto de fabricación o diseño, el fabricante todavía puede ser responsable si al vender el producto éste no brindó ninguna advertencia acerca de una característica que hace que el material sea peligroso al usarse en situaciones que sean razonablemente previsibles para el fabricante. Por consiguiente, sería necesario dirimir cuál sería el deber, si alguno, de Steri-tech, Inc. en el presente caso de proveer las advertencias o instrucciones acerca de la inflamabilidad del material "Tyvek". En síntesis, la adecuacidad y el alcance de las advertencias, si algunas, es una materia esencial de hechos que debe ser dilucidada en un juicio plenario. Por las razones antes expuestas, se revoca la determinación del foro de instancia que declaró con lugar la moción de sentencia sumaria del codemandado Steri-tech, Inc.

---

(16) Dicha característica conocida como el *melt-drip effect* ha sido mencionada como una de las cualidades peligrosas que el estandard comercial CS-191 del *Federal Flammable Fabrics Act* no contempla o mide adecuadamente, al establecer éste si determinada tela (*fabrics*) es segura para poner en el comercio interestatal. A.J. Patton, *Flammable Fabrics—A Hazard Evaluation*, 18 (Núm. 4) Trial 33 (1982); 6 *Am. Law Prod. Liab. 3d* Sec. 87:3 (1987).

## II

Como mencionáramos anteriormente, en el presente caso la parte demandante instó una acción de daños y perjuicios contra los oficiales o directores de la Squibb Manufacturing, Inc., *en su capacidad personal*, por su negligencia en cuanto a las medidas de seguridad aplicables a la víctima. Invocó, como fuente y fundamento de su demanda por daños, el Art. 31 de la Ley de Compensaciones por Accidentes del Trabajo, 11 L.P.R.A. sec. 32, que en lo pertinente dispone:

> *Sec. 32. Responsabilidad de tercero; subrogación*
>
> En los casos en que la lesión, enfermedad profesional o la muerte que dan derecho de compensación al obrero, empleado o sus beneficiarios, de acuerdo con este Capítulo, le hubiere provenido bajo circunstancias que hicieren responsables a tercero de tal lesión, enfermedad o muerte, el obrero o empleado lesionado o sus beneficiarios podrán reclamar y obtener daños y perjuicios del tercero responsable de dicha lesión, enfermedad o muerte dentro del año subsiguiente a la fecha en que fuere firme la resolución del caso por el Administrador del Fondo del Seguro del Estado, y éste podrá subrogarse en los derechos del obrero, empleado o sus beneficiarios para entablar la misma acción ....

Sostiene el recurrente que, según el análisis que hicimos del citado Art. 31 de la ley en el caso de *López Rodríguez v. Delama*, 102 D.P.R. 254 (1974), la inmunidad patronal no se extiende a los oficiales, accionistas, directores o coempleados. Por ende, en virtud del Art. 31, ante, se puede demandar a un oficial corporativo por sus actos negligentes ya que éste es el tercero a que se refiere la ley.

Por su parte, el codemandado señor Borrero sostiene que el caso de *López Rodríguez v. Delama*, ante, es distinguible del caso de autos. En primer lugar alega que el caso se circunscribe solamente a coempleados, siendo *obiter dictum* lo referente a oficiales, directores o accionistas. También señala que en dicho caso el demandado actuaba como

un mero coempleado y no en sus funciones o deberes oficiales, por lo que la obligación contravenida en *López Rodríguez v. Delama*, ante, es diferente a la de autos. Alega, en adición, el recurrido que la segunda demanda enmendada lo que imputa es haber sido negligente al no proveer un sitio seguro de empleo.[17] Este deber, según el recurrido, es un deber no delegable de la corporación y no del oficial corporativo. Por tal razón, entiende que aunque un oficial corporativo puede ser el tercero a que se refiere la ley, éste, en el caso de autos, le cobija la inmunidad patronal debido a que el oficial corporativo no tiene un deber preexistente de mantener un lugar seguro de trabajo, ya que este deber recae exclusivamente en el patrono.

En *López Rodríguez v. Delama*, ante, una corporación era dueña de un bar que era coadministrado por el codemandado, señor Delama, que a su vez era tesorero y accionista del patrono asegurado. Todas las noches al finalizar las operaciones del negocio el señor Delama, a petición del "patrono", conducía a la demandante (una camarera) a su hogar. Uno de esos días, el demandado perdió el control del vehículo mientras conducía en exceso de velocidad e impactó a otros vehículos, causándole daños a la demandante. Ésta se limitó a demandar al conductor del vehículo (señor Delama) y su compañía aseguradora. El tribunal de instancia declaró sin lugar la demanda por entender que la inmunidad provista al patrono en el Art. 20 de la Ley de Compensaciones por Accidentes del Trabajo,

---

[17] En el párrafo 35 de la Segunda Demanda Enmendada el recurrente hizo las siguientes alegaciones en contra de los oficiales demandados:

"Que los oficiales y demandados de la Squibb Mannufacturing, Inc., que se menciona en el párrafo tres de la demanda, fueron negligentes al no proveer un sitio seguro de trabajo, al no instruir adecuadamente a Rivera sobre el uso de las soluciones químicas, al no proveerle los reglamentos y órdenes adecuadas, al ordenarle que usara esta solución en las paredes y los pisos, entre otras, y faltaron a su deber fiduciario para con su empleado Rivera y por tal razón son responsables por la muerte de Rivera." Solicitud de revisión, *exhibit* XV, pág. 6.

11 L.P.R.A. sec. 21, era extensiva al empleado Delama. Al revocar dicha determinación, este Tribunal expresó que:

> Aunque no existe unanimidad de criterio, la doctrina prevaleciente sostiene que la inmunidad que le confiere el estatuto al patrono asegurado no se extiende a los directores, oficiales, accionistas, administradores o co-empleados de dicho patrono. [Citas omitidas.] En ausencia de expresión legislativa sobre el significado del vocablo "terceras personas" usado en el Art. 31 de la Ley, debemos conferirle su significado usual asumiendo que incluye a toda persona aparte del empleado lesionado y su patrono asegurado. La razón de ser de la inmunidad conferida por el estatuto estriba en el hecho de que la ley establece un sistema de compensaciones por accidentes del trabajo mediante el cual el obrero recibe compensación independientemente de quién sea responsable del accidente. Se ha considerado que es razonable y justo que en reciprocidad se le otorgue inmunidad al patrono, sobre quién recae el peso económico del sistema, mediante el pago de cuotas anuales. Pero ciertamente no hay justificación en extender la inmunidad que confiere la ley a directores, oficiales u otros empleados del patrono asegurado que no contribuyen personalmente para sufragar los gastos del Fondo cuando éstos han incurrido en negligencia y han causado daños a otros empleados. [Citas omitidas.] Como expone Larson en la obra antes citada a la pág. 226.3:
> "Es cierto que se puede hacer un argumento teórico para justificar, por ejemplo, extender la inmunidad a co-empleados, como se ha indicado anteriormente. Pero este tipo de argumento se torna superficial al colocarse ante las realidades prácticas envueltas en este tipo de pleito. Con excepción de uno u otro pleito contra un director corporativo, la mayoría de los pleitos contra co-empleados no valen la pena a no ser que éstos estén asegurados contra responsabilidad pública. Si un empleado es lesionado por la negligencia en el manejo del automóvil de otro empleado, la verdadera interrogante es si se va a permitir a la compañía aseguradora del co-empleado negligente a disfrutar de un enriquecimiento injusto, a expensas del empleado lesionado, levantando la defensa del remedio exclusivo. Visto desde esa perspectiva, parece haber poca justificación para extender la inmunidad más allá del patrono en sí, quien es el que asume la responsabilidad real o potencial de indemnizar a su empleado mediante el pago de las primas." (Traducción nuestra.)
> A la luz de la doctrina expuesta, es evidente que la inmuni-

dad que le confiere la ley a Café Beaumont, Inc., patrono asegurado, no se extiende al Sr. Delama por ser éste un mero co-empleado gerencial. Siendo éste responsable, responde también su compañía aseguradora. (Escolio omitido.) *López Rodríguez v. Delama*, ante, págs. 258–259.[18]

No cabe la menor duda que en *López Rodríguez v. Delama*, ante, interpretamos de manera literal el Art. 31 de la ley, a los efectos de que el "vocablo terceras personas" incluye a toda persona aparte del empleado lesionado y su patrono asegurado. En resumen, el caso resuelve en términos generales que un empleado lesionado puede demandar en daños y perjuicios a un coempleado *a consecuencia de los actos negligentes o torticeros cometidos personalmente por éste.* Lógicamente el término "coempleado" incluye supervisores, oficiales, accionistas y cualquier otro empleado de igual rango.[19]

Somos del criterio, sin embargo, que los hechos y circunstancias del caso de autos son distinguibles de los del caso de *López Rodríguez v. Delama*, ante, razón por la cual la norma allí implantada no es de entera aplicación a los hechos del caso hoy ante nuestra consideración. Nos explicamos.

En *López Rodríguez v. Delama*, ante, resolvimos que la "inmunidad conferida al patrono asegurado no se extendía al Sr. Delama por ser éste un mero co-empleado gerencial".

---

[18] Cabe señalar que esta doctrina que no extiende la inmunidad patronal a los coempleados de una corporación se ha convertido en minoritaria. El tratadista Larson expresa que en la actualidad sólo diez (10) estados la mantienen. Dispone el referido autor que "[a] strong tide toward coemployee inmunity has been running for some year. As recently as 1974, a mayority of states permitted suits against coemployees .... In fourteen additional states, although coemployee liability for negligence has been abolished by statute, it has been retained either by statute or by judicial decisions, for intentional wrongs." Véase 2A *Larson, The Law of Workmen's Compensation* Sec. 72.11, págs. 14-68 a 14-73 y esc. 13.1 (1992).

[19] Como mencionáramos en la nota al calce núm. 17, la mayoría de las jurisdicciones estatales que tenían disposiciones similares a nuestro Art. 31 de la ley, también interpretaron que la inmunidad patronal no se extendía a los co-empleados. De igual forma, estos tribunales extendieron dicho razonamiento a los supervisores y demás oficiales corporativos. Véase *Larson*, ante, Sec. 72.13, pág. 14-75, y Sec. 72.24(a), págs. 14-134 a 14-136.

El señor Delama *respondía por su negligencia personal*, consistente la misma en conducir un vehículo de motor de manera descuidada. Esta conducta antijurídica, naturalmente, *se basa en el deber preexistente impuesto por el Art. 1802 del Código Civil*, 31 L.P.R.A. sec. 5141, que le impone a toda persona el conducir un vehículo de motor como un hombre prudente y razonable. *Este deber, sin duda, existe independientemente de la relación patrono-empleado.*

■ Claramente, en *López Rodríguez v. Delama*, ante, no había ninguna justificación para extender la inmunidad patronal al coempleado, *ya que sus actos negligentes no estaban relacionados con sus funciones o deberes corporativos.* Su deber de cuidado, y responsabilidad, surgía del deber general impuesto por el Art. 1802, ante. Por tal razón, entendemos que la norma implantada en *López Rodríguez v. Delama*, ante, se circunscribe a aquellos casos *en que el deber de cuidado quebrantado por el coempleado constituye un incumplimiento personal de una obligación proveniente del Art. 1802 del Código Civil, ante.*

En el caso de autos, sin embargo, la obligación del señor Borrero como presidente de la Squibb Manufacturing, Inc. *proviene de sus deberes como oficial corporativo y no de una obligación personal.* Se pretende hacer responsable al oficial corporativo por un deber u obligación general que el patrono le debe a sus empleados.

Diversos tribunales estatales y federales se han enfrentado a controversias similares a la planteada en autos.[20] Estos, en su inmensa mayoría, sostienen que un oficial corporativo está inmune de responsabilidad por faltar al deber indelegable de la corporación de proveerle a sus empleados un lugar seguro de empleo. Véanse: *Porter v.*

---

[20] Cabe señalar que algunos de estos casos estatales o federales han quedado inoperantes en virtud de las enmiendas legislativas que hoy en día no permiten a los obreros lesionados demandar a otros coempleados por los daños sufridos en el empleo a consecuencia de los actos negligentes de éstos. No obstante, su análisis y razonamiento siguen siendo persuasivos e ilustrativos.

*Nutter*, 913 F.2d 37 (1er Cir. 1990); *Tyler v. Fuller*, 569 A.2d 764 (1990); *Rounds v. Standex Intern.*, 550 A.2d 98 (1988); *Allen v. Kizer*, 770 S.W.2d 137 (1987); *Athas v. Hill*, 476 A.2d 710 (1984); *Greco v. Farago*, 427 A.2d 98 (1984); *Santiago v. Becton Dickinson & Co., S.A.*, 571 F. Supp. 904 (D. P.R. 1983); *State ex rel. Badami v. Gaertner*, 630 S.W.2d 175 (1982); *Craft v. Scaman*, 715 S.W.2d 531 (1986); *Dawley v. Thissius*, 231 N.W.2d 555 (1975); *West v. Jessop*, 339 So. 2d 1136 (1976); *Kruse v. Schieve*, 213 N.W.2d 64 (1973). Véase, en general, Nota, *Workers' Compensation: Third-Party Tort Liability of Corporate Officer to Injured Workers*, 76 A.L.R.4th 365 (1990).

Sobre este punto, resultan particularmente ilustrativos los señalamientos que hace el tratadista Larson:

> Most courts have held that status as a corporate officer, director, or stockholder is not of itself a bar to liability as a coemployee, since the corporate entity is the employer.
>
> The clearest case for such liability is that in which the corporate officer is acting in his capacity as an employee—even a managerial employee—and in which the conduct involved is merely the kind of negligence or other misconduct that would normally make any coemployee liable.
>
> . . . . . . . .
>
> ... At the other extreme, the clearest case for immunity is that in which the defendant's alleged liability is predicated entirely upon his status as stockholder, and not upon some active conduct on his part.
>
> Between these two extremes are various shades of closer cases, turning on the extent to which the defendant is in effect the alter ego of the corporation, or is at least acting as an agent or representative of the corporation, or being charged with violations of duties that are not his personal duties, but the nondelegable duties of the corporation.
>
> . . . . . . . .
>
> Short of this, *most courts* will hold the defendant immune if the act with which he is charged is *an act done in his official capacity as an agent or representative of the corporation. Suit is also barred if the duty allegedly violated was a nondelegable duty of the corporation, such as a duty to provide a safe place to work*—as distinguished from the duty of care owed by one em-

ployee to another. (Énfasis suplido.) 2A *Larson, The Law of Workmen's Compensation* Sec. 72.13. (1992).

 En esta jurisdicción, al igual que en la mayoría de la jurisdicciones estatales, *la obligación legal de proveer un lugar seguro de empleo recae en el patrono.* Éste tiene un deber *no delegable* de proveer un lugar de trabajo libre de riesgos para sus empleados. Véanse: Ley de Seguridad y Salud en el Trabajo, 29 L.P.R.A. sec. 361(e);[21] *Vda. de Costas v. P.R. Olefins,* 107 D.P.R. 782, 788 (1978). El término "no delegable" significa que hay algunas obligaciones que un patrono le debe a sus empleados que impiden que el patrono pueda librarse de responsabilidad frente al obrero lesionado, delegando esa función en otros coempleados.[22]

 Dentro de la estructura corporativa, el patrono descarga su obligación de proveer un lugar seguro de empleo a través de sus agentes, empleados u oficiales

---

[21] La Ley Núm. 16 de 5 de agosto de 1975, según enmendada, 29 L.P.R.A. sec. 361(e), dispone en lo pertinente que:

"(a) Cada patrono deberá proveer a cada uno de sus empleados empleo y un sitio de empleo libre de riesgos reconocidos que estén causando o que puedan causar muerte o daño físico a sus empleados.

"(b) Cada patrono deberá proveer y asegurar el uso de aparatos de seguridad, salvaguardias y el equipo de protección personal, según sea prescrito o requerido por el Secretario, o que sea razonablemente necesario, sin costo alguno para cualquier empleado.

"(c) Cada patrono deberá cumplir con las normas de seguridad y salud ocupacionales promulgadas bajo las secs. 361 a 361aa de este título y con las reglas, reglamentos y órdenes emitidas de acuerdo a las mismas."

[22] Este concepto, el cual antecede a los esquemas de compensación a obreros, proviene del derecho común norteamericano y el mismo era utilizado por el obrero lesionado para responsabilizar al patrono e impedir que éste alegara las defensas de negligencia del compañero (*fellow servant doctrine*). Bajo el derecho común, "el hecho de que un deber sea no-delegable s[o]lamente afectaba la responsabilidad de la corporación y no la responsabilidad de los oficiales individuales. Los oficiales corporativos a quienes se le delegó ese deber seguían siendo responsables por los daños sufridos por el tercero; el efecto de la determinación de no-delegable es que la corporación y los oficiales eran solidariamente responsables de los daños". 3A *Fletcher Cyc. Corp.* Sec. 1137 (Perm. ed. 1992). Esta norma del derecho común no opera en el contexto de compensación obrero, debido a que bajo este sistema el patrono renunció a las defensas de negligencia del compañero, asunción de riesgos y otras. Véanse: *Fireman's Fund Am. Ins. Co. v. Coleman,* 394 So. 2d 334 (1981); 57 *C.J.S. Master and Servant* Secs. 578–579.

corporativos. De tal forma, un obrero lesionado siempre encontrará un oficial que está envuelto en decisiones en torno a la seguridad de los empleados, o a un supervisor que está encargado de implantar las normas de seguridad de la compañía. *Determinamos, por razones de política pública, que cuando la alegada negligencia del supervisor u oficial corporativo se deriva del incumplimiento de esta obligación, el obrero lesionado no puede demandar al co-empleado*; el deber de supervisión adecuada es una obligación del empleado a su patrono y no a su compañero de trabajo. Mientras el empleado u oficial está descargando las responsabilidades generales de su puesto, cualquier violación a este deber es imputable exclusivamente al patrono. En tales casos, el empleado lesionado solamente puede recurrir al Fondo del Seguro del Estado.

Nuestra razón de decidir está inspirada en el propósito racional de la Ley de Compensaciones por Accidentes del Trabajo y la política pública que la inspira. A tales efectos, en *Ruiz Díaz v. Vargas Reyes*, 109 D.P.R. 761, 763 (1980), expresamos que:

> El principio de seguro exclusivo y de inmunidad del patrono, ancla de la Ley ... surgió como remedio de justicia social para la indefensión del trabajador en un naciente régimen industrial que conjugaba la libre aceptación ... "su pobreza y no su voluntad consentía". El remedio a esta situación se desarrolló en un concepto de responsabilidad estricta o absoluta del patrono que eliminó las defensas de negligencia contribuyente, asunción de riesgo y negligencia del compañero de trabajo, de modo de "compromiso bajo el cual el trabajador acepta una compensación limitada, generalmente inferior a la que un [juez] concedería por sus daños, a cambio de la ampliada responsabilidad del patrono, y la seguridad de que sería pagado"[23] con la correla-

---

[23] "La responsabilidad absoluta ha promovido resultados satisfactorios en tanto los obreros lesionados tienen asistencia inmediata, una fuente común de fricción entre patrono y empleado ha sido eliminada, una carga onerosa de litigación costosa ha sido suprimida, y se ha logrado una relación más armoniosa entre patronos y empleados que la permitida por el viejo sistema. Prosser, *op. cit.*, pág. 531." *Ruiz Díaz v. Vargas Reyes*, 109 D.P.R. 761, 764 esc. 3 (1980).

tiva inmunidad del patrono acogido al estatuto de seguro. La exclusividad del remedio está declarada en el Art. 20 de la Ley, 11 L.P.R.A. sec. 21, al ordenar que siempre que el patrono asegure sus obreros y empleados, el derecho de compensación provisto en el estatuto será el único remedio en contra del patrono. (Énfasis en el original suprimido y escolios omitidos.)

■ *El propósito de nuestra Ley de Compensaciones por Accidentes del Trabajo no fue el de transferir la carga de los accidentes industriales de un empleado a otro.* Entendemos en consecuencia, que permitir que los obreros lesionados demanden a los oficiales corporativos, vulneraría y trastocaría el esquema estatutario que fue diseñado para imponerle a los patronos ciertas obligaciones exclusivas siempre que los empleados sufran lesiones en el trabajo. Imponerle responsabilidad a los oficiales corporativos por los accidentes del trabajo que están relacionados con una condición insegura de empleo tendría la consecuencia indeseable de desalentar la aceptación, y desempeño, de dichas posiciones por personas capacitadas y obligaría, a nuestro juicio, que los patronos tuvieran que asegurar e indemnizar a sus oficiales o empleados corporativos bajo otro tipo de seguro o cubierta. En adición, el coempleado sería responsable por la violación de un deber de la corporación que ya fue compensado a través del pago de las primas al Fondo del Seguro del Estado.

■ *Por consiguiente, resolvemos que bajo nuestro esquema de compensación a obreros, a un empleado —ya sea oficial, accionista o supervisor— le cobija la inmunidad patronal cuando la alegada negligencia del coempleado consiste en alegadamente violentar el deber no delegable de la corporación de proveer un lugar seguro de empleo.*[24]

---

[24] No resolvemos, por no estar planteado, si la inmunidad patronal le cobija a este empleado —oficial, accionista o supervisor— cuando ha mediado, de parte de éste, un acto intencional y/o un acto en que ha mediado negligencia crasa y en contravención al deber del patrono de proveer un lugar seguro de empleo. Reiteramos, en consecuencia, lo resuelto en *Santiago Hodge v. Parke Davis Co.*, 126 D.P.R.

Varios tribunales estatales y federales han adoptado razonamientos similares a los aquí expuestos.(²⁵)

█ Resolvemos, en resumen, que bajo el citado Art. 31 de la Ley de Compensaciones por Accidentes del Trabajo, un oficial, agente o empleado será responsable por los daños sufridos por un compañero empleado cuando el acto negligente causante de los mismos sea distinto e independiente del deber del patrono de proveer un lugar seguro de empleo, *López Rodríguez v. Delama*, ante; *Santiago Hodge v. Parke Davis Co.*, ante. Por ende, la responsabilidad de un coempleado está limitada a sus deberes u obligaciones personales como ciudadano de no causar daño a otras personas, conforme el Art. 1802 del Código Civil, ante,(²⁶) y no

---

1 (1990); caso en que rechazamos extender, *en forma automática*, a terceros la inmunidad patronal.

(²⁵) En *Rounds v. Standex Intern.*, 550 A.2d 98, 102 (1988), el Tribunal Supremo de New Hampshire expresó:

"Therefore, we now hold that the duty to maintain a safe workplace rests exclusively with the employer, not the employee. To hold otherwise would vitiate the purpose of the workers' compensation law. In executing its duties an employer must always find employees to carry them out. [Cita omitida.] To charge the employee with the same duty as the employer would effectively sidestep the workers' compensation law and hold the employee liable for breach of the same duty already compensated for through the payment of benefits. Furthermore, we are mindful of the additional public policy concern in exposing officers and employees to personal liability with every injury caused by an unsafe workplace.... [Citas omitidas.] An employee will be liable in negligence for the injuries of a fellow employee only upon breach of a duty distinct from the employer's duty to maintain a safe workplace."

En *Athas v. Hill*, 476 A.2d 710, 718–719 (1984), el Tribunal de Apelaciones de Maryland expresó que:

"We conclude that the supervisory coemployees in this case are not amenable to Athas' suit ... even though the law of this State does permit one employee to sue a fellow employee for negligence....

"Nevertheless, the duties to provide a safe place to work and to retain competent, non-violent employees have always rested on the employer.... Under Maryland law the employer owes his employees a nondelegable duty to provide a safe place to work and, thus, the employer cannot escape liability for breach of this duty. Therefore, a supervisory coemployee who performs the nondelegable duty of the employer does not thereby assume a personal duty toward his fellow employees.... Thus, under the workmen's compensation scheme ... the supervisory employee should not be held liable for breaching a duty such as providing a safe place to work."

(²⁶) En *Santiago v. Becton Dickinson & Co., S.A.*, 571 F. Supp. 904, 908–909 (1983), el Tribunal de Distrito Federal para Puerto Rico expresó:

"It should be pointed out ... whatever duty may be imposed on the individual officer for their failure to discover the allegedly toxic characteristics of the dye is not

en el descargo de los deberes generales de su puesto o cargo oficial que ocupa en el negocio del patrono.

## III

En la situación relativa al codemandado Borrero, *no* hay controversia sobre hechos sustanciales; esto es, ambas partes están contestes en que se trata de una cuestión estrictamente de derecho, a saber: si el codemandado Borrero es o no responsable, en su carácter personal, ante la parte demandante, por razón de ser el ejecutivo principal de una corporación que alegadamente no proveyó a sus empleados un lugar seguro de empleo. No se le imputa al referido codemandado haber incurrido en acto individual, o separado, de negligencia. En vista de ello, y a la luz de la norma hoy establecida, procede confirmar la resolución del tribunal de instancia que declaró con lugar la moción de sentencia sumaria parcial presentada por el codemandado señor Borrero.

Por los fundamentos anteriormente expuestos, *se expide el auto de revisión y se dictará Sentencia revocatoria de la sentencia sumaria parcial dictada por el foro de instancia a favor del codemandado Steri-tech, Inc., devolviéndose di-*

---

to be found in their duties as either direct or indirect employers, and that whatever action this knowledge required that they take is not to be borrowed from the general activities required of employers in providing a safe working place for its employees. The immunity provided by Prwaca to insured employers for their negligent acts and omissions with regard to their employer-employee duties which is part of the bargain agreed upon by the Puerto Rico Legislature in exchange for guaranteed no-fault compensation, *see: Ruiz Díaz v. Vargas Reyes*, 109 DPR at 763–65, is not to be circumvented by merging it with other civil liabilities in broad, conclusory type allegations. Likewise, the individual defendant's liabilities arising from their general corporate obligations and duties as officers and directors for the corporate acts of the entity run afoul with the doctrine of limited corporate liability. Their liability, then, is to be circumscribed and focused strictly in terms of their personal involvement and their ordinary civil responsabilities to plaintiffs, if any, based on the general principles of civil liability embodied in Art. 1802, the cases applying these principles, their interpretation by civil law commentators that may be useful to the analysis. See: *Valle v. American International Insurance Co.*, 108 PRR, 108 DPR 692 (1979)." (Escolio omitido.)

*cho asunto para la continuación de procedimientos ulterio-*
*res compatibles con lo aquí expuesto y resuelto. En segundo*
*término, se confirma la sentencia sumaria parcial dictada*
*por el foro de instancia a favor del codemandado señor*
*Borrero.*

El Juez Asociado Señor Fuster Berlingeri concurrió con el resultado sin opinión escrita. El Juez Asociado Señor Negrón García se inhibió.