*1213 TEXTO COMPLETO DE LA SENTENCIA
Los miembros de la sucesión de Francisco Torres Rivera, por sí y en representación del causante, mediante el recurso de apelación cuyo número es KLAN-2006-01505 solicitan que revisemos la sentencia sumaria emitida en el caso de epígrafe por el Tribunal de Primera Instancia, Sala Superior de San Juan. Ésta desestimó su demanda, sobre daños y perjuicios, por la vía ordinaria, contra R. J. Reynolds Tobacco Co. y otros, relacionada a la muerte^ del Sr. Torres Rivera; luego de fumar tres cajetillas de cigarrillos diariamente por cincuenta y dos (52) años. Además, mediante el recurso de certiorari cuyo número es KLCE-2007-00178 solicitan revisemos la resolución que aprobó el memorando de costas en el referido litigio. Por los fundamentos que expondremos, se confirma la sentencia del T.P.I. y se deniega la expedición del auto de certiorari.
I
Según el escrito de apelación, el “18 de julio de 1998, el Sr. Francisco Torres Rivera falleció víctima de muerte súbita, enfisema, edema pulmonar agudo, hipertensión arterial e infarto al miocardio. Tenía 65 años de edad. Nació el 23 de febrero de 1933. Comenzó afumar, muy joven, a la edad de 12 ó 13 años, esto es dentro de los anos 1946-1947. Fumó cigarrillos por más de 52 años hasta el día de su muerte. Consumía alrededor de 60 cigarrillos al día, lo que equivale aproximadamente a 3 cajetillas de cigarrillos al día o más.” 
El 14 de julio de 2000, los miembros de la sucesión del Sr. Francisco Torres Rivera, compuesta por su viuda, la Sra. Marina Rodríguez Ríos, y sus hijos, Teresita, Mayra y Francisco y Eric Francisco Torres Rodríguez, por sí y en representación del causante, representados por el Ledo. Luis G. Rivera Marín,
*0 [[Image here]]
[[Image here]]
[[Image here]]
[[Image here]]
*1214 presentaron una demanda contra RJ. Reynolds Tobacco Co., et ais. (Reynolds). Posteriormente, la demanda fue enmendada para incluir como codemandante a Carla Michelle Torres Zayas. El 17 de junio de 2003, la representación legal de los demandantes pasó a la Leda. Amarilys Arocho Maldonado. La demanda sufrió varias enmiendas, la última de ésta luego de cinco años y medio de litigio, el 10 de febrero de 2006. Mediante esta última enmienda se presentaron nuevas alegaciones respecto a las fuentes de responsabilidad bajo el Art. 1802 del Código Civil, 31 L.P.R.A. see. 5141. En sus diferentes versiones, la demanda ha alegado como fuentes de responsabilidad los siguientes fundamentos: (1) falsa representación, (2) falsa representación a los consumidores, (3) incumplimiento de garantía expresa, (4) incumplimiento de garantía implícita, (5) culpa y/o negligencia, (6) negligencia, (7) fraude o engaño, (8) dolo o dolo contractual, (9) responsabilidad absoluta, (10) advertencias inadecuadas, (11) defecto de diseño, (12) expectativa del consumidor, (13) riesgo y utilidad, y (14) mconstitucionalidad del “Cigarette Labeling Act” bajo la Constitución de Puerto Rico (Escrito de apelación, pags. 18 a 19). La parte apelante admite haber renunciado a las primeras cuatro causas de acción de la lista presentada. Reynolds negó que existiese causa de acción bajo cualquiera de las catorce alegaciones mencionadas en las diferentes versiones de la demanda.
Luego de un extenso descubrimiento de prueba, el 30 de junio de 2004, Reynolds presentó una moción de sentencia sumaria, consistente de setenta y ocho (78) páginas, con un apéndice de 4,330 páginas. En ésta discutieron las causas de acción, hasta entonces presentadas por los demandantes, aduciendo que varias de las causas de^ acción aludidas estaban impedidas en derecho por la doctrina de campo ocupado (“conflict preclusion ) y que respecto a las otras, la parte demandante carece de medios de prueba para sostener las causas de acción. El volumen del apéndice de la moción de sentencia sumaria se explica, en parte, porque en el mismo se incluyeron las transcripciones de las deposiciones de dieciséis (16) potenciales testigos, incluyendo a todos los demandantes. La parte demandante presentó su oposición a la moción de sentencia sumaria el 2 de septiembre de 2004, acompañando evidencia documental.
Con respecto a la solicitud para que se emitiera una sentencia sumaria, Reynolds presentó ocho (8) mociones adicionales y la parte demandante presentó cuatro (4) mociones adicionales, siendo acompañadas las referidas doce (12) mociones adicionales con evidencia documental adicional. El tribunal celebró una vista argumentativa para que las partes tuvieran la oportunidad de presentar oralmente sus argumentos y contestar las preguntas del tribunal. El 13 de octubre de 2006 el tribunal emitió sentencia desestimando, con perjuicio, la tercera demanda enmendada, concediéndole costas a Reynolds, sin imposición de honorarios de abogado. La solicitud de reconsideración de los demandantes fue declarada no ha lugar. Inconformes, los demandantes presentaron la apelación que aquí consideramos, señalando que el tribunal incidió al:

“1- Concluir que los demandantes no presentaron prueba para sostener que el producto vendido por los demandados fue un factor sustancial que causó la muerte del causante.

2- No aplicar el análisis de la doctrina de riesgo-beneficio en la causa de acción por defecto de diseño.

3- Dictar Sentencia Sumaria y desestimar la reclamación de responsabilidad absoluta por falta de advertencias de un producto sin considerar toda la evidencia que refutaba los hechos alegados por los demandados.

4- No considerar evidencia de reparaciones posteriores requeridas por mandato de ley como prueba de que una etiqueta de advertencia era necesaria con anterioridad a la vigencia de la ley.

5- No considerar evidencia consistente en informes oficiales gubernamentales que refutaban una controversia relacionada a responsabilidad absoluta por falta de advertencias.

La apelación fue acompañada por un apéndice de 2,748 páginas. 
 Reynolds presentó su alegato en 
*1215
oposición a la apelación, incluyendo otro apéndice de 5,430 páginas, el cual contiene escritos y evidencia documental no incluida en el apéndice del recurso de apelación presentado por los demandantes.

Oportunamente, Reynolds presentó el memorando de costas, y el 17 de noviembre presentó unas enmiendas, en las que redujo varias de las partidas de costas incluidas en el memorando. Los demandantes se opusieron a lo solicitado en el memorando de costas, según originalmente presentado, y Reynolds presentó una réplica a la oposición. El 2 de enero de 2007, el tribunal emitió una resolución aprobando el memorando de costas enmendado, en la cual eliminaba una de las partidas reclamadas por Reynolds y ajustaba otra de las partidas, reduciéndola. Los demandantes solicitaron reconsideración, a la que Reynolds se opuso. El tribunal denegó la reconsideración.
Inconformes, los apelantes presentaron una Petición de Certiorari, el cual consolidamos con la apelación, señalando que abusó de su discreción el tribunal al aprobar el memorando de costas. Oportunamente, Reynolds se opuso a la Petición de Certiorari. A solicitud de los apelantes/peticionarios, consolidamos la apelación y la Petición de Certiorari.
Es pertinente señalar, que el escrito de la parte apelante, luego del listado de cinco errores en la página 19 del escrito, presenta en las páginas 20 a 62 una discusión repetitiva y un tanto desorganizada que convierte en impráctico guiar nuestra discusión a base de la argumentación de los errores señalados, exponiendo el derecho pertinente y aplicando el derecho a los hechos del caso bajo discusión, para concluir si incidió el tribunal apelado. Por lo tanto, discutiremos los señalamientos en conjunto, organizando nuestra discusión a base de los requisitos para probar una causa de acción de daños y perjuicios, bajo la responsabilidad absoluta de un manufacturero, las advertencias inadecuadas, defecto de diseño, expectativa del consumidor, riesgo y utilidad y la inconstitucionalidad del Federal Cigarette Laveling and Advertising Act, bajo la Constitución de Puerto Rico.
Previamente indicamos que la parte apelante/peticionaria ha reclamado derecho al resarcimiento de daños, al amparo del Art. 1802, supra, en diferentes etapas del pleito, bajo las siguientes teorías jurídicas: (1) falsa representación, (2) falsa representación a los consumidores, (3) incumplimiento de garantía expresa, (4) incumplimiento de garantía implícita, (5) culpa y/o negligencia, (6) negligencia, (7) fraude o engaño, (8) dolo o dolo contractual, (9) responsabilidad absoluta, (10) advertencias inadecuadas, (11) defecto de diseño, (12) expectativa del consumidor, (13) riesgo y utilidad, (14) inconstitucionalidad del Federal Cigarette Labeling and Advertising Act” bajo la Constitución de Puerto Rico (Escrito de apelación, págs. 17 a 18).
En la nota al calce número 21, a la página 17, la apelante/peticionaria concede haber renunciado a los primeros cuatro fundamentos. Los fundamentos cinco (5) al ocho (8), a saber: culpa y/o negligencia, negligencia; fraude o engaño; y dolo o dolo contractual, no se discuten ni argumentan en el escrito de apelación más allá de una mención transitoria. Al examinar la moción de sentencia sumaria, la oposición a ésta y las doce (12) mociones posteriores intercambiadas por las partes, es evidente que los fundamentos cinco (5) al ocho (8) son frívolos. No se desprende de estos escritos que la parte demandante tenga alegaciones específicas, válidas en derecho, para respaldar lo alegado, mucho menos evidencia para probar estas causas de acción. Concluimos que no incidió el Tribunal de Primera Instancia al desestimar dichas causas de acción.
II
Los fundamentos de error reseñados están relacionados, o son subcategorías, de un reclamo de responsabilidad absoluta por daños y perjuicios. Ante la ausencia de legislación, en nuestra jurisdicción, que defina en específico los elementos de la causa de acción de responsabilidad absoluta extracontractual del fabricante de productos defectuosos, el Tribunal Supremo de Puerto Rico ha laborado para llenar dicho vacío, bosquejando los elementos de esta causa de acción. Rivera v. Superior Packaging, 132 D.P.R. 115 (1992), y Aponte v. Sears Roebuck, 144 D.P.R. 830 (1998), presentan los elementos principales de la doctrina de responsabilidad absoluta pertinente a las controversias del caso de autos. En el primero de los referidos casos, a *1216 las págs. 125 a 130, el Tribunal resumió la doctrina sobre como sigue:
Respondlendo a las necesidades sociales de Puerto Rico, por vía judicial y como cuestión de política publica establecimos y adoptamos en nuestra jurisdicción la norma de responsabilidad absoluta del fabricante de productos defectuosos. Mendoza v. Cervecería Corona, Inc., 97 D.P.R. 499 (1969); Montero Saldaña v. Amer. Motors Corp., 107 D.P.R. 452 (1978). En ambos casos, citamos con aprobación la norma de responsabilidad absoluta extracontractual ("strict liability in torts"), vertida por el Tribunal Supremo de California en el caso de Greenman v. Yuba Power Products, Inc., 377 P.2d 897, 900 (Cal. 1962). El Juez Presidente Traynor expresó asila norma: [ujn fabricante o manufacturero responde absolutamente en daños y perjuicios cuando un artículo que pone en el mercado, a sabiendas de que va a ser usado sin una inspección de defectos evidencia un defecto que ocasiona daños a un ser humano [y que] la responsabilidad no es una regida por a ley. de garantías contractuales sino por la ley de responsabilidad absoluta en daños y perjuicios". (Traducción nuestra.) Las razón de política pública detrás de la norma, nos ilustra la decisión de Greenman v Yuba Power Products Inc., ante, pág. 901, es que "jejl propósito de tal responsabilidad es asegurar que el costo de los danos resultantes de los productos defectuosos sean sufragados por los fabricantes que enviaron tales productos al mercado en vez de las personas damnificadas que están impotentes para protegerse ellos mismos". (Traducción nuestra.) 6
En resumen, la parte demandante tiene que establecer en un caso de esta naturaleza, en primer lugar, la existencia del defecto en el producto y, en segundo término, que dicho defecto fue la causa legal de los daños o lesiones sufridas por ella. Así pues, bajo la norma de responsabilidad absoluta que en este tipo de casos rige en nuestro ordenamiento, el perjudicado no tiene que probar la negligencia del fabricante, ni del vendedor pero si tiene que probar que el producto era defectuoso. W. P. Keeton, Prosser & Keeton on Torts, 5ta ed- H Brau del Loro, Los Danos y Perjuicios Extracontractuales en Puerto Rico, 2da. ed., San Juan, Publicaciones J.T. , pag.S' 896;897; Cabe señalar, sm embargo, "que si bien el consumidor no tiene que establecer directamente la negligencia del fabricante, el fabricante no es asegurador de todos los daños que puedan ocasionar sus añadido*) Mendoza v. Cervecería Corona Inc., supra, pág. 512. (Cursivas en original, subrayado
En Greenman v.Yuba Power Products Inc., ante, se señaló que " el fabricante o vendedor era responsable por los defectos de diseño y fabricación del cual el lesionado no tiene conocimiento, que hace que el producto sea inseguro para el uso para el cual fue destinado" o [para el uso para el cual se fabrica o se vende], osteriormente, en el caso de Cronin v. J.B.E. Olson Corporation, ante, el Tribunal Supremo de California expreso que no se le impondrá responsabilidad absoluta (strict liability) a un manufacturero o vendedor cuando as lesiones sufridas por la víctima provienen de un uso del producto que no es razonablemente previsible para e atacante. En consecuencia, se modificó la norma de Greenman, ante, al eliminar la frase "un uso para el cual fue destinado". En fin, señala el caso de Cronin, ante, que el fabricante o vendedor es responsable por los defectos de su producto, siempre y cuando el lesionado lo utilice para un uso que sea razonablemente previsible para el fabricante. Cronin v. J.B.E. Olson Corporation, ante; Barker v. Lull Engineering Co., Inc ante-Herminio Brau del Toro, op. cit., pág. 901-902. (Énfasis suplido.)
En el campo de product liability existen tres (3) tipos de defectos que dan margen a la aplicación de la doctrina de responsabilidad absoluta; estos son: defectos de fabricación, defectos de diseño y defectos por laS advertencias 0 instrucciones. Anderson v. Owen-Corning Fiberglass Corp., 281 Cal. Reptr 528 (Cal. 1991); Cavers v. Cushman Motors Sales Inc., 157 Cal. Reptr. 142 (1979); Barker v. Lull Engineering Co., Inc., ante’ Cronin v. JBE Olson Corporation, ante; Canifax v. Hercules Powder Co., 116 Cal Reptr 552 (1965 ); Greenman v. Yuba Power Products Inc., supra; Keeton, op. cit., pág. 695; Montero Saldaña v. Amer Motors Corp., ante;, Herminio Brau del Toro, op. cit., pág. 901.
En cuanto a los defectos de fabricación, este Tribunal adoptó la definición de "defecto" sugerida por el *1217 entonces Juez Presidente Traynor, en el citado caso de Greenman v. Yuba Power Products Inc, ante, a los efectos de que "un producto defectuoso puede ser definido como aquél que falla en igualar la calidad promedio de productos similares y el manufacturero es entonces responsable por los daños resultantes de~ las desviaciones de la norma". Mendoza v. Cervecería Corona Inc., ante, pág. 512 esc. 7; Montero Saldaña v. Amer. Motors Corp., ante, pág. 462; R.J. Traynor, The Ways and Meaning of Defective Products and Strict Liability, 32 Tenn. L. Rev. 363, 367 (1965). En Barker v. Lull Engineering Co. Inc., ante, el Tribunal Supremo de California limitó la norma propuesta por el Juez Traynor a los casos de defectos de fabricación. 
Para determinar si hay un defecto de diseño, el Tribunal Supremo de California elaboró un análisis, o test , de dos alternativas. [9] Así pues, el demandante prevalecerá en un caso de defecto de diseño si demuestra que: "(1) el producto falló en comportarse en forma tan segura como un usuario ordinario habría esperado al usar el producto para el uso para el cual fue destinado o para el cual previsiblemente podría ser usado, o si demuestra que, (2) [a] el diseño del producto fue la causa próxima de los daños, y [b] el demandado no probó que en el balance de intereses, los beneficios del diseño en cuestión sobrepasan los riesgos de peligro inherentes en el diseño". (Traducción nuestra.) Barker v. Lull Engineering Co. Inc., ante, pag. 446. Bajo esta segunda alternativa, se traslada al fabricante la carga de la prueba de que los beneficios del diseño utilizado sobrepasan los riesgos inherentes al mismo. Id. (Énfasis suplido.)
En tercer lugar, aunque un producto no adolezca de defectos de fabricación o de diseño, el mismo es considerado defectuoso si el fabricante o vendedor no le ofrece al usuario o consumidor aquellas advertencias o instrucciones que sean adecuadas en torno a los peligros o riesgos inherentes en el manejo o uso del producto. Dicho deber se extiende a todos los usos del producto que sean razonablemente previsibles para el fabricante. La omisión de no dar las advertencias expone al fabricante a responsabilidad, si éste sabía, o debió haber sabido del peligro o riesgo envuelto, y la necesidad de dar la advertencia para garantizar el uso más seguro del producto. Anderson v. Owens-Coming Fiberglass Corp., ante; Rosburg v. Minnesota Min. & Mfg. Co., 226 Cal. Reptr. 299 (1986); De-León v. Commercial Mfg & Supply Co., 195 Cal. Reptr. 867 (1983); Groll v. Shell Oil Co., 196 Cal. Reptr. 52 (1983); Cavers v. Cushman Motor Sales Inc., ante; 3 Am Law Prod. Liab. 3d, Sec. 32 (1987); Stuart Madden, op cit., Cap. 10. (Énfasis suplido.)
Seis años más tarde, en Aponte v. Sears Roebuck, 144 D.P.R. 830, 838-843 (1998), el Tribunal expuso.

“Responsabilidad absoluta extracontractual

En nuestra jurisdicción aplica la norma de responsabilidad absoluta del fabricante o vendedor por daños causados por productos defectuosos o peligrosos. Rivera et al. v. Superior Pkg., Inc. et al., 132 D.P.R. 115 (1992); Montero Saldaña v. Amer. Motors Corp., 107 D.P.R. 452 (1978); Mendoza v. Cervecería Corona, Inc., 97 D.P.R. 499 (1969). Bajo esta norma, el demandante tiene que probar que el producto era defectuoso y que el defecto le ocasionó un daño. Esto es, tiene que demostrar que el producto defectuoso fue la causa legal de las lesiones sufridas. Rivera et al. v. Superior Pkg., Inc. et al., supra, págs. 125-126; H. Brau del Toro, Los daños y perjuicios extracontractuales en Puerto Rico, 2da ed., San Juan, Publicaciones J.T.S., 1986, Vol. II, Cap. XVI, págs. 896 897 y 906. Sin embargo, el peijudicado no tiene que probar la negligencia del fabricante. Rivera et al. v. Superior Pkg., Inc. et al, supra. Ahora bien, el fabricante no es asegurador de todos los daños que puedan ser ocasionados por sus productos. Mendoza v. Cervecería Corona, supra, pág. 512. Será responsable de los daños sufridos por el demandante cuando éste haya utilizado el producto para un uso razonablemente previsible. Rivera et al. v. Superior Pkg., Inc. et al, supra. También, hemos determinado que, en los casos donde se impone responsabilidad extracontractual, según la doctrina de responsabilidad absoluta, aplica la norma de la graduación de la culpa. Montero Saldaña v. Amer. Motors Corp., supra, págs. 463-465. (Énfasis suplido.)
Quedan incluidos en la doctrina de responsabilidad absoluta del fabricante, los defectos de fabricación del producto, los defectos de diseño del producto, y los defectos por la insuficiencia en las advertencias o *1218 instrucciones del producto. Rivera et al. v. Superior Pkg., Inc. et al, supra; Montero Saldaña v. Amer. Motors Corp., supra, pags. 461-462; Brau del Toro, op. cit., pág. 901.
En Rivera et al. v. Superior Pkg., Inc. et al, supra, pag. 130, expresamos que un producto es considerado defectuoso si el fabricante o vendedor no le ofrece al usuario o consumidor aquellas advertencias o instrucciones que sean adecuadas en tomo a los peligros o riesgos inherentes en el manejo o uso del producto.” Añadimos que /dJicho deber se extiende a todos los usos del producto que sean razonablemente previsibles para el fabricante." íd.
. jUn Py°dU?!° eS defectuoso P°rque las advertencias o instrucciones que ofrece el fabricante son insuficientes o inadecuadas: (1) cuando los riesgos de uso del producto no son aparentes ni anticipables por los usuarios o consumidores; (2) en el caso de productos inevitablemente peligrosos aunque sean útiles; o (3) cuando no se corrobora la efectividad de los avisos o instrucciones. Brau del Toro, op. cit., pág. 904.
Los objetivos al ofrecer información y advertencias sobre un producto son: (1) facilitar que el consumidor lo utilice sabiamente, reduciendo el riesgo de una posible lesión, y (2) promover la autonomía individual en el proceso decisional sobre la adquisición del producto. W. P. Keeton, D.G. Owen, J.E. Montgomery, Products Liability and Safety, Mitineóla, The Foundation Press, 1980, págs. 294-295.
, La,°bPfCi°n del fabricante de ofrecer instrucciones y advertencias sobre un producto incluye, entre otros, el deber de: (1) ofrecer instrucciones sobre el manejo del producto; (2) advertir sobre posibles riesgos en el uso del producto ya sean latentes u ocultos; (3) alertar sobre las consecuencias dañinas que pueden surgir al utilizar el producto de forma incorrecta; y (4) ofrecer instrucciones sobre la forma de evitar lesiones, así como instrucciones sobre el tratamiento de primeros auxilios en caso de una lesión. J.S. Allee, Products Liability, Nueva York L J Semmars-Press, 1991, Sec. 4.06.
Lo esencial es determinar si la información provista por el fabricante o vendedor fue adecuada, tomando en cuenta la naturaleza del producto y sus posibles usos. Además, es necesario determinar si el fabricante sabía o debió haber sabido del peligro o riesgo envuelto. Rivera et al. v. Superior Pkg., Inc. et al., supra. La responsabilidad del fabricante depende de si las deficiencias de las advertencias o instrucciones convirtieron el producto en uno irrazonablemente peligroso, o sea, más peligroso que lo que esperaría un consumidor ordinario. M. Stuart Madden, The Duty to Warn in Products Liability: Contours & Criticism, 89 W V L Rev 221 222 (1987V Restatement of the Law (Second) of Torts, Sec. 402A(i), (Ap. 1965). (Énfasis suplido.)
En resumen, existen cuatro (4) elementos básicos para determinar si el fabricante cumplió o no con el deber de ofrecer advertencias o instrucciones apropiadas: (1) el fabricante sabía o debió haber sabido del peligro inherente del producto; (2) no incluyó advertencias o instrucciones, o éstas no fueron adecuadas; (3) la falta de advertencias convirtió> el producto en uno inherentemente peligroso; (4) la falta de instrucciones o advertencias apropiadas fue la causa próxima de las lesiones del demandante. Allee, op. cit., Sec. 4.02.
Para determinar si las advertencias o instrucciones de un producto son adecuadas se debe examinar el tamaño lugar e intensidad del lenguaje o símbolo utilizado, a la luz de la forma y del contenido de éste. Las advertencias o instrucciones deben estar diseñadas en un lenguaje directo, para impresionar a un usuario pmdente y razonable del producto, alertándolo sobre la naturaleza y amplitud del peligro envuelto. Stuart Madden, op. cit., pág. 223.
Además, se tiene que analizar la naturaleza del peligro implicado, la forma en que se utiliza el producto, la carga económica que se impone al fabricante al requerirle incluir instrucciones o advertencias, y la probabilidad de que una advertencia en particular alertará adecuadamente a los usuarios o consumidores sobre los riesgos que representa el uso del producto, ya sea correcta o incorrectamente. El contenido de las advertencias debe ser comprensible para el promedio de los consumidores. Stuart Madden, op cit., pág. 311. Esto requiere que las advertencias e instrucciones provistas por el fabricante de un producto trasciendan barreras de lenguaje. 
*1219 En fin, el análisis sobre la adecuacidad de las advertencias y/o instrucciones debe realizarse a la luz del conocimiento o la experiencia de aquéllos que razonable y previsiblemente utilizarán un producto determinado. Si el consumidor promedio no puede razonablemente anticipar y apreciar cabalmente las condiciones peligrosas de un producto o el riesgo a una lesión por su uso, el fabricante debe advertirlo. A la inversa, un fabricante no tiene que anunciar un peligro si el consumidor promedio ordinariamente tiene conocimiento de los peligros del producto. 3 Am. Law Prod. Liab.3d, Sec. 32:61 (1993). (Énfasis suplido.)
Ahora bien, bajo la doctrina de responsabilidad absoluta del fabricante, el hecho de que el peligro o riesgo al utilizar una batería de automóvil sea obvio, por ser uno inherente al mismo, no necesariamente excluye la indemnización por daños. Una advertencia puede reducir el riesgo de daños o lesiones aun cuando se trate de la utilización de productos inherentemente peligrosos. 3 Am. Law Prod. Liab., supra, Sec. 32:64. Le corresponde al juzgador de los hechos examinar si, a la luz de la totalidad de las circunstancias, el aviso fue adecuado, si fue la causa próxima de los daños del demandante y si no hubo una causa interventora o concurrente. 
A base de nuestra revisión, concluimos que no incidió el tribunal apelado al desestimar la demanda por razón de que los demandantes carecían de prueba para establecer una causa de acción bajo la doctrina de responsabilidad absoluta del manufacturero por productos defectuosos.
TTI
De las tres vertientes bajo la doctrina de responsabilidad extracontractual del fabricante de productos defectuosos, las alegaciones de los demandantes se refieren a sólo dos de éstas: defectos de diseño y defectos por insuficiencia en las advertencias o instrucciones. El demandante que alega defecto en el diseño puede utilizar una de dos maneras para probar su caso, que se denominan: “(1) consumer contemplation test, or (2) a risk-utility test”, Prosser & Keeton on Torts, 5ta ed, pág. 702.
Bajo el “consumer-contemplation test”, también conocido como el consumer expectations test , la parte demandante tiene que probar que “el producto falló en comportarse en forma tan segura como un usuario ordinario habría esperado al usar el producto para el uso para el cual fue destinado o para el cual previsiblemente podría ser usado”. Rivera et al. v. Superior Pakg., Inc., et al., supra, pág. 129. Ello requiere, que se demuestre una divergencia entre lo que el usuario ordinario esperaba del producto y el comportamiento o efecto real del producto. Al aplicar la norma al caso de autos, para establecer esta causa de acción, los demandantes tenían que probar que para el período de tiempo pertinente el usuario ordinario creía que el fumar cigarrillos no tema efectos adversos a la salud. Mas adelante, al considerar la alegación de falta o insuficiencia de advertencias, concluiremos que el período de tiempo pertinente es el de los años 1954 al 1969. El año 1954 es la fecha en que se introdujeron los cigarrillos Winston en Puerto Rico y el año 1969 es el año en que entró en efecto la ley federal que requiere que todas las cajetillas de cigarrillos incluyan la advertencia: “WARNING: THE SURGERON GENERAL HAS DETERMINED THAT CIGARETTE SMOKING IS DANGEROUS TO YOUR HEALTH’.
Bajo el “risk-utility test”, también conocida como riesgo/beneficio, la parte demandante tiene que probar que: (1) “el diseño del producto fue la causa próxima de los daños”, y (2) “el demandado no probó que en el balance de intereses, los beneficios del diseño en cuestión sobrepasan los riesgos de peligro inherentes en el diseño" Rivera et al. v. Superior Pakg., Inc. et al., supra, pág. 129; Barker v. Lull Engineering Co. Inc., 573 P.2d 443, 446 (1978).
Un examen de la opinión en Barker, supra, demuestra el tipo de alegación y prueba y cómo se dividen las responsabilidades de alegar y producir prueba cuando se presenta una causa de acción por producto defectuoso bajo el anáfisis de riesgo/beneficio. En primer lugar, se requiere que el demandante establezca un caso prima facie de que los daños se deben a un defecto en el diseño del producto. Ello requiere que dicha parte presente alegaciones específicas en que identifique y señale cuáles aspectos del diseño causaron los daños y que *1220 respalde las alegaciones con la opinión pericial de un perito en el diseño de este tipo de productos. En el caso específico de Barker, supra, dicho caso se cita como el origen o primer desarrollo sistemático de esta doctrina.
El Tribunal Supremo de California expresó el criterio para determinar que el diseño de un producto es defectuoso como sigue:
"[A] product is defective in design: (1) if the plaintiff demonstrates that the product failed to perform as safely as an ordinary consumer would expect when used in an intended or reasonably foreseeable manner, or (2) If the plaintiff proves that the product's design proximately caused his injury and the defendant fails to prove, in light of the relevant factors discussed above, that on balance the benefits of the challenged design outweigh the risk inherent in such design." (Enfasis suplido.)
De Baker, supra, queda claro que bajo el análisis de riesgo/beneficio, para poder determinar que el diseño del producto era defectuoso, se requiere que Ia parte demandante presente un perito en diseflo del tipo de producto envuelto quien: (1) estudie los hechos especIficos del caso, (2) prepare un informe pericial sobre lo que en su opinion constituyen defectos en diseño que fueron la causa eficiente de los daños; y (3) testifique en la vista sobre los fundamentos de su opinion pericial. Dicho perito tiene que identificar aspectos o ~reas o decisiones del disefio del producto que, segtin su análisis y opinion, causaron el daflo sufrido por la parte demandante, o podIan haberlo evitado. Esta crItica, naturalmente, debe incluir alternativas de disefio realistas, que eliminarIan o significativamente reducirIan el riesgo. Cuando la parte demandante ha presentado su perito y establecido lo anterior, se considera que ha establecido un caso prima facie de defectos en el producto. Una vez la parte demandante ha cumplido con dicha carga de Ia prueba, el manufacturero viene ilamado a producir prueba para defender las decisiones de diseño incorporadas en el producto. Para ello, el demandante debe presentar los informes y testimonio de sus peritos en diseflo y, además, presentar la evidencia pertinente para justificar las decisiones de diseflo incorporadas en el diseflo del producto. Dicho proceso de justificaciOn puede Ilevarse a cabo mediante un análisis de riesgolbeneficio, costo/beneficio, u otra base racional para su decision. Véase Barker, supra, y Rivera et al. v. Superior Packaging et al., supra, nota al calce Num. 9. 
Bajo esta alternativa, para probar que un producto es defectuoso en diseño, la parte demandante no puede simplemente alegar que el causante usó el producto y que sufrió un daño, y a base de ello alegar que es evidente que el ¿seno del producto es defectuoso. Como expresó el Primer Circuito Federal en Punzano-Díaz v. Ford Motor Co. , Slip Copy, 2007 WL 60620, en el cual el producto que se alegaba era defectuoso en ¿seño era una bolsa de aire ( airbag”) de un automóvil:
“The mere allegation of injury itself is not sufficient to establish a defect in the design, because if that were the case, whenever there is an injury the burden would invariably shift [to the manufacturer]. If plaintiff fails to introduce evidence to prove the first element of his claim, that is the airbag system design proximately caused his injury, then he is not able [under his design defect theory of the case] to prove the existence of the defect in the airbags and that such defects caused him damages. Whatever the reason for the deployment of the airbags at a Delta V eight [mileS per hour]’ there is no evidence pointing to a defective design of the airbag system as the culprit. (Enfasis suplido.)
En el caso de autos, la parte demandante nunca indicó que fuese a presentar un perito en el diseño de cigarrillos mucho menos ofreció un informe pericial de dicho perito. En las alegaciones de la demandante hay una falta de alegaciones específicas de aspectos del diseño de los cigarrillos Winston que lo convertían en un ¿seño defectuoso. Al ser confrontada con la moción de sentencia sumaria, en la que se solicita la desestimación de la demanda, ¿cha parte no in¿có que hubiese contratado un perito sobre el ¿seño de cigarrillos, por lo que necesariamente tampoco ofreció un informe pericial en el cual ¿cho perito especificase exactamente cuáles *1221 decisiones del diseño de los cigarrillos Winston lo convertían en más peligroso que otros cigarrillos. Por lo tanto, al no tener un perito contratado respecto el diseño de los cigarrillos Winston, la parte demandante no demostró que en el juicio pudiese cumplir con la carga de alegar y producir el testimonio pericial para establecer un caso prima facie de defecto en el diseño. Al no cumplir con dicha carga de alegar y al no demostrar la capacidad de producir testimonio que respalde las alegaciones específicas de defectos en el diseño de los cigarrillos Winston, procede desestimar cualquier reclamo de responsabilidad por defectos en el diseño de los cigarrillos Winston.
Por lo tanto, bajo la teoría de defecto en el diseño del producto sólo queda por considerarse la primera de las dos alternativas, el “consumer’s expectations test”. Bajo dicha alternativa, la parte demandante tiene que probar que “el producto falló en comportarse en forma tan segura como un usuario ordinario habría esperado al usar el producto para el uso para el cual fue destinado o para el cual previsiblemente podría ser usado”. Rivera et al. v. Superior Pakg., Inc. et al., supra, pág. 129. Para demostrar que los cigarrillos Winston eran defectuosos, bajo dicha alternativa, la parte demandante tendría que probar que el usuario común de éstos en Puerto Rico, para el período del 1954 al 1969, creía que el fumar cigarrillos no tenía efectos adversos para la salud.
ÍY
Según, veremos más adelante, un testigo lego no está capacitado para establecer las expectativas, o sea, lo que conocía y creía, el usuario común para períodos que se remontan alrededor de medio siglo atrás, del 1954 al 1969. Para ello se requiere el testimonio de un perito historiador, cuyo entrenamiento y experiencia en investigación histórica lo capaciten para llegar a conclusiones sobre las expectativas o el conocimiento del usuario común, y que éste haya hecho una investigación suficientemente extensa y rigurosa sobre la materia que va a testificar. Para demostrar educación y entrenamiento, un curriculum vitae que incluya estos aspectos es necesario. Para demostrar experiencia en investigación histórica, la evidencia del resultado de otras investigaciones históricas es lo idóneo, que incluya el que los resultados de la investigación hayan sido presentados en foros adecuados y aceptadas por editores o una audiencia de profesionales en el área, capacitados para juzgar la misma. Además de lo anterior, el propuesto perito historiador tiene que haber llevado a cabo una investigación específica sobre el asunto en particular sobre el cual va a emitir su opinion pericial. Dicha investigación debe ser suficientemente extensa y rigurosa que sus conclusiones sean aceptables por otros historiadores profesionales como conclusiones confiables. Para dicho propósito, la parte demandante ofreció como su perito historiador a la Sra. Marly Ferrer Montalvo.
Ahora bien, dicha opinión pericial es también central para establecer la causa de acción de producto defectuoso por insuficiencia de las advertencias. Por lo tanto, antes de evaluar si la Señora Marly Ferrer llena los requisitos, examinaremos lo requerido para establecer la causa de acción por advertencias inadecuadas. Luego de examinar dicha causa de acción, consideraremos si la Señora Marly Ferrer Montalvo debe ser aceptada por el tribunal como perito historiadora para el propósito de establecer cuál era el conocimiento o expectativa del usuario común en Puerto Rico para el período 1954 al 1969. En el presente caso, dicha conclusión aplica a ambos, lo requerido para establecer una causa de acción por insuficiencia de las advertencias y lo requerido para establecer defecto en el diseño del producto bajo el consumers expectations test”.
Reclamo de Advertencias Inadecuadas
En el caso de autos, el reclamo de advertencias inadecuadas se divide en dos controversias separadas cronológicamente como sigue: la primera, respecto las advertencias para el período desde el año 1969 hasta la muerte del causante en el año 1998; la segunda, para el período desde la introducción de los cigarrillos Winston en Puerto Rico en el año 1954 hasta el año 1969.
Desde el año 1969 en adelante, el asunto sobre las advertencias se convierte en una controversia sobre campo ocupado, que precluye el reclamo de la parte demandante, ya que el Congreso legislo sobre este aspecto, proveyendo *1222 que la legislación federal ocupaba el campo. Este asunto fue expresamente atendido por el Tribunal Supremo Federa en Cipollone v. Liggett Group, Inc., 505 U.S. 504, 514-515 (1992), cuya decisión expone el análisis de la legislación pertinente como sigue:

In July, 1965, Congress enacted the Federal Cigarette Labeling and Advertising Act (1965 Act or Act). The 1965 Act effectively adopted half of the FTC's [proposed] regulation: the Act mandated warnings on cigarette packages ([Section] 5(a)), but barred the requirement of such warnings in cigarette advertising ([Section] 5(b)).

Section 2 of the Act declares the statute's two purposes: (1) adequately informing the public that cigarette smoking may be hazardous, to health, and (2) protecting the national economy from the burden imposed by diverse, nonuniform, and confusing cigarette labeling and advertising regulations. In furtherance of the first purpose, [Section 4 of] the Act made it unlawful to sell or distribute any cigarettes in the United States unless the package bore a conspicuous label stating: "CAUTION: CIGARETTE SMOKING MAY BE HAZARDOUS TO YOUR HEALTH. In furtherance of the second purpose, [Section 5] captioned "Preemption," provided in part• (Énfasis suplido.) J

(a) No statement relating to smoking and health, other than the statement required by section 4 of this Act shall be required on any cigarette package. (Énfasis suplido.) ’

(b) No statement relating to smoking and health shall be required in the advertising of any cigarettes the packages of which are labeled in conformity with the provisions of this Act.

Although the Act took effect January 1, 1966, ...the Act provided that its provisions affecting the regulation of advertising would terminate on July 1, 1969.

As that termination date approached, federal authorities prepared to issue further regulations on cigarette advertising. The FTC announced the reinstitution of its 1964 proceedings concerning a warning requirement for cigarette advertisements. 34 Fed. Reg. 7917 (1969). The Federal Communications Commission (FCC) announced that it would consider "a proposed rule which would ban the broadcast of cigarette commercials by radio and television stations." Id., at 1959. State authorities also prepared to take actions regulating cigarette advertisements.

It was in this context that Congress enacted the Public Health Cigarette Smoking Act of1969 (1969 Act or Act) which amended the 1965 Act in several ways. First, the 1969 Act strengthened the warning label, in part by requiring a statement that cigarette smoking "is dangerous," rather than that it "may be hazardous." Second, the 1969 Act banned cigarette advertising in "any medium of electronic communication subject to [FCC] jurisdiction." Third, and related, the 1969 Act modified the preemption provision by replacing the original [Section] 5(b) with a provision that reads:

(b) No. requirement or prohibition based on smoking and health shall be imposed under State law with respect to the advertising or promotion of any cigarettes the packages of which are labeled in conformity with the provisions Oj tillsiiCb
El análisis del Tribunal Supremo Federal concluye que respecto a las advertencias requeridas, la Ley de 1965 no ocupa el campo completamente, pero las enmiendas de 1969 hechas por el Public Health Cigarette Smoking Act of 1969 (Ley del 1969), conllevan que la ley federal ocupe el campo respecto las advertencias requeridas en todos sus aspectos. El efecto de campo ocupado de la Ley de 1969 fue reiterado en Medtronic, Inc. v. Lohr, 518 U.S. 470, n.9 (1996), la cual expone como sigue:
[TJhe pre-emptive effect of the statute in Cipollone was not dependent on the issuance of any agency regulations. The territory exclusively occupied by federal law was defined in the text of the statute itself; that *1223 text specified the precise warning to smokers that Congress deemed both necessary and sufficient. ... [T]he statute in Cipollone was clearly intended to have a broader pre-emptive effect than its 1965 predecessor. See 505 U. S., at 515, 520-521.” (Énfasis suplido.)
Puerto Rico quedó incluido en las leyes antes citadas, pues así expresamente se dispone en 15 U.S.C. § 1332(3).
Concluimos que, respecto al período desde el año 1969 hasta la muerte del Sr. Torres Rivera, la ley federal ocupa el campo en cuanto a las advertencias que tienen que llevar las cajetillas de cigarrillos. O sea, es aplicable al caso de autos el mismo análisis hecho por el Tribunal Supremo de Puerto Rico en S.L.G. v. S.L.G., 150 D.P.R. 171 (2000), al expresar que “En el caso de marras, distinto a Aponte Rivera, supra, estamos ante un producto que cae bajo el ámbito de [una ley del Congreso,] la FHSA. Es por ello que los criterios o requisitos a aplicar a la situación presente, respecto las advertencias necesarias, son los que establece la referida legislación federal.” (Énfasis suplido.)
Al considerar lo provisto por las leyes federales citadas, especialmente la Ley de 1969, vemos que éstas, además de precluir la causa de acción por advertencias inadecuadas para el período desde el 1969 al presente, también nos permiten considerar la validez de la causa de acción número catorce (14). En ésta, la parte demandante había reclamado que se declarara la “inconstitucionalidad del Cigarette Labeling Act bajo la Constitución de Puerto Rico”. El estatuto federal del 1969 expresamente dispuso, que los Estados no podrán requerir otro lenguaje en las cajetillas de cigarrillos que el dispuesto por dicha ley. Esta prohibición está relacionada directamente con el objetivo expresado por el propio Congreso, el evitar obstáculos al comercio interestatal debidos a divergentes requerimientos en cuanto a advertencias se refiere. El lenguaje tajante que prohíbe variaciones en las advertencias incluye el que las advertencias sean hechas en español, pues ello constituiría una variación contraria a la letra y el espíritu de la Ley de 1969. Por lo tanto, concluimos que no procede la causa de acción número catorce (14), mediante la cual se solicitó se declarara la inconstitucionalidad del Cigarette Labeling Act bajo la Constitución de Puerto Rico.
En cuanto el asunto de advertencias se refiere, existe otra fecha que considerar. La demanda alega que el causante siempre consumió cigarrillos marca Winston. No obstante, del expediente surge como una afirmación no contradicha que la marca Winston se introdujo en Puerto Rico en el año 1954. Por lo tanto, el período respecto a la necesidad de advertencias por la parte demandada se circunscribe a los años 1954 al 1969, un período de quince (15) años de los cuarenta y dos (42) años que el causante fumó. 
Las advertencias o instrucciones insuficientes o inadecuadas constituyen un defecto que genera responsabilidad cuando los riesgos de uso del producto no son aparentes ni anticipables por los usuarios o consumidores. Aponte v. Sears Roebuck, supra; H. Brau del Toro, Los Daños y Perjuicios Extracontractuales en Puerto Rico, San Juan, Publicaciones J.T.S., 1986, pág. 904. (Énfasis suplido.) Por lo tanto, para que la parte demandante tenga una causa de acción respecto el período desde el 1954 al 1969, ésta tiene que demostrar que durante dicho período los riesgos de fumar cigarrillos no eran aparentes ni anticipables por un usuario típico de éstos. La casuística pertinente refina el concepto del “usuario”, definiéndolo como el usuario común u ordinario del producto, no un usuario en particular, como lo es el causante en este caso.
y
A base de lo anterior, el próximo asunto para atender es qué prueba se requeriría para establecer la causa de acción alegada por los demandantes sobre advertencias inadecuadas. De la discusión anterior, se desprende que lo alegado equivale a reclamar que respecto al período desde 1954 al 1969, el usuario común u ordinario de cigarrillos en Puerto Rico no conocía ni anticipaba que el fumar cigarrillos era perjudicial para la salud. La naturaleza de la proposición que tiene que establecer el demandante mediante la pruebe que presente se refiere a las creencias generales que existían hace medio siglo atrás en Puerto Rico. No es pertinente, mucho menos suficiente, el presentar evidencia sobre lo que el causante creía durante dicho período, en caso que hubiese hecho *1224 expresiones inequívocas sobre ello, al igual que tampoco lo es lo que algunos de sus parientes creyesen. Para que el demandante establezca su caso tiene que presentar en el testimonio de una persona con entrenamiento y experiencia como historiador y que, además, haya hecho una investigación específica sobre la creencia de: (1) el usuario común, (2) de Puerto Rico, (3) durante los años 1954 a! 1969, (4) respecto si el fumar era malo para la salud. Así lo concluyó el tribunal en la sentencia apelada al expresar que:
... Concluimos que es necesario testimonio pericial para establecer lo que conocía o desconocía comúnmente el consumidor promedio y ordinario hace más de sesenta años atrás. Esta determinación no la puede hacer un testigo lego sin conocimiento de historia. Estimamos persuasiva la determinación del Primer circuito en Cruz Vargas [v. R.J. Reynolds Tobacco Co., 348 F.3d 271, 277 (1st. Cir. 2003)]: “la defensa sobre el ‘conocimiento común’ se evalúa objetivamente y, no obstante su nomenclatura, es una cuestión técnica que involucra metodología, financiamiento, y fuentes de información fuera de la competencia de un testigo lego, al menos en cuanto concierne a historia de hace cuarenta o cincuenta años atrás”. [22] (Traducción del tribunal de instancia.) (Enfasis añadido.) ”
Los demandantes propusieron a la Sra. Marly Ferrer Montalvo para testificar sobre el conocimiento o creencia de un usuario común en Puerto Rico durante los años 1954 a 1969 respecto a si el fumar era perjudicial para la salud. La sentencia apelada dedica un análisis de nueve (9) páginas (Sentencia, págs. 16 a 25) al asunto de si procedía aceptar a la Sra. Marly Ferrer como perito historiadora, a base de su entrenamiento profesional, experiencia en investigación, integridad e imparcialidad, y la investigación específica que alegaba la parte demandante que había llevado a cabo ella, según se refleja en su “Reporte del Experto” (Ap. Dte. págs. 1688 a 1695) y C.V. de Marly Ferrer Montalvo (Ap. Dte. págs 14731-474). Basado en dicho examen, el tribunal concluyó que “la señora Ferrer Montalvo no posee las cualificaciones necesarias que le permitan testificar como perito historiadora en este caso. Dado lo crucial que es dicha conclusión como uno de los fundamentos principales para la desestimación la demanda, pasamos a examinar el estándar para la revisión por un tribunal apelativo del rechazo del perito propuesto, luego de lo cual examinaremos algunos de los fundamentos más importantes respecto la calificación de la perito propuesta por los demandantes.
La cualificacion pericial es una zona dentro de la sana discreción del tribunal de instancia y donde sólo habrá revocación por claro abuso de discreción. ” E. Chiesa, Tratado de Derecho Probatorio, Publicaciones J.T.S., San Juan, 1998, t. 1, pág. 565 (Énfasis suplido.); Kumbo Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 152 (1999); General Electric Co. v. Joiner, 522 U.S. 136, 138-139 (1997); Currier v. United Techs. Corp., 393 F.3d 246,251 (1st. Cir. 2004); DeLuca v. Merrel Dow Pharmaceuticals, 911 F.2d 941,944 (3er. Cir. 1990); In re: Air Crash Disaster at New Orleans, 795 F.2d 1230, 1233-1234 (5to Cir. 1986); Friendship Heights Associates v. Vlastimil Koubek, 785 F.2d 1154, 1159-1160 (4to. Cir. 1986). 
En In re. Air Crash Disaster at New Orleans, supra, el Quinto Circuito Federal elaboró sobre el estándar de revisión apelativa, al igual que advirtió sobre la mala práctica de considerar aceptable como peritos a personas no calificadas, bajo la excusa de que ((su carencia de calificaciones sólo afecta el peso de la prueba ”, exponiendo como sigue:
Since the adoption of the Federal Rules of Evidence in 1975, we have accorded trial courts considerable discretion in determining the admissibility of opinion evidence by experts. We have said that the discretion is "broad" and that the determination of admissibility should be sustained "unless manifestly erroneous." See United States v. Johnson, 575 F.2d 1347, 1360 (5th Cir.1978), cert. denied, 440 U.S. 907, 99 S.Ct. 1214, 59 L. Ed.2d 454 (1979); Crawford v. Worth, 447 F.2d 738, 740-41 (5th Cir. 1971). This deference reflects the superior opportunity of the trial judge to gauge both the competence of the expert and the extent to which his opinion would be helpful to the jury. Despite the seeming breadth of the language we have used to describe this deference, trial court rulings regarding the admission of expert testimony remain reviewable. We have not left all such decisionmaking to trial judges, nor should we. (Énfasis suplido.)
*1225 "... Under the Federal Rules of Evidence, experts not only explain evidence, but are themselves sources of evidence. ...
... [T]he ultimate issue in such cases can too easily become whatever an expert witness says it is, and trial courts must be wary lest the expert become nothing more than an advocate of policy before the jury. Stated more directly, the trial judge ought to insist that a proffered expert bring to the jury more than the lawyers can offer in argument. Indeed, the premise of receiving expert testimony is that it, "will assist the trier of fact to understand the evidence or to determine a fact in issue" Fed. R. Evid. Rule 702. (Énfasis suplido.)
Our customary deference also assumes that the trial judge actually exercised his discretion. In saying this, we recognize the temptation to answer objections to receipt of expert testimony with the shorthand remark that the jury will give it "the weight it deserves." This nigh reflexive explanation may be sound in some case, but in others it can mask a failure by the trial judge to come to grips with an important trial decision. Trial judges must be sensitive to the qualifications of persons claiming to be expert. Because the universe of experts is defined only by the virtually infinite variety of fact questions in the trial courts, the signals of competence cannot be catalogued. Nevertheless, there are almost always signs both of competence and of the contribution such experts can make to a clear presentation of the dispute. ... [EJxperts whose opinions are available to the highest bidder have no place testifying in a court of law, before a jury, and with the imprimatur of the trial judge's decision that he is an "expert." (Énfasis suplido.)

In sum, we adhere to the deferential standard for review of decisions regarding the admission of testimony by experts. Nevertheless, we take this occasion to caution that the standard leaves appellate judges with a considerable task. We will turn to that task with a sharp eye, particularly in those instances, hopefully few, where the record makes it evident that the decision to receive expert testimony was simply tossed off to the jury under a "let it all in" philosophy. Our message to our able trial colleagues: it is time to take hold of expert testimony in federal trials. (Enfasis suplido.)”

A diferencia de un testigo común, al perito se le permite testificar sobre sus opiniones (R. 52 de Evidencia), incluyendo su opinión sobre la cuestión última (R. 57 de Evidencia), frecuentemente se le permite permanecer en el salón de sesiones mientras otras personas testifican, puede opinar respecto situaciones hipotéticas, puede basar sus contestaciones y opiniones en testimonio ofrecido por otros respecto al cual el perito no tiene conocimiento personal, se haya enterado de éste mediante testimonio ofrecido en el tribunal o fuera de éste (R. 56 de Evidencia). En general, se permite al perito testificar en muchas formas que no se le permitiría a un testigo común. Véase discusión en Chiesa, supra, vol. 1, págs. 541 a 613. Es obvio el potencial de abuso si se permite a personas testificar como peritos cuando realmente la persona no posee las cualidades de un perito. Por ello, el Tribunal Supremo Federal ha interpretado las Reglas de Evidencia respecto al testimonio de peritos al efecto de que al hacer una determinación de admisibilidad de un propuesto testimonio pericial, el tribunal tiene que hacer una determinación de que el testimonio propuesto es confiable. Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 589 (1993); Kumho Tire Co. Ltd. et al. v. Carmichael et al, 526 U.S. 137, 152 (1999). La opinión en Kumho, supra, aclaró que la necesidad de hacer una determinación de que el testimonio pericial propuesto es confiable aplica a todos los peritos, no sólo a los peritos en el área de las ciencias. En cuanto a los peritos en otras áreas, los factores para determinar la confiabilidad del testimonio pericial pueden ser modificados respecto los criterios sugeridos en Daubert, supra, interpretando, añadiendo o eliminado criterios, siempre y cuando que se mantenga el objetivo de asegurar que el testimonio sea confiable.
El 1ro de septiembre de 2004, los demandantes acompañaron su escrito en oposición a la sentencia sumaria con una copia del informe de la señora Marly Ferrer, indicando que se proponían presentar dicho informe y el testimonio de ella bajo las Reglas sobre testimonio por peritos. Mediante moción del 13 de octubre de 2004, Reynolds indicó que presentaría una moción oponiéndose a que se aceptara a la señora Ferrer como perito (Ap. Reynolds pág. 4434).
*1226 El 1ro de diciembre de 2004, los demandantes solicitaron la recusación de la juez a cargo del caso, por lo que los procedimientos estuvieron detenidos hasta el 3 de octubre de 2005, cuando el Tribunal Supremo emitió el mandato en el caso CC-2005-0514, convirtiéndose en final y firme, la denegatoria de la recusación.
El 28 de octubre de 2005, Reynolds presentó una moción exponiendo en detalle sus fundamentos para solicitar que se excluyera el testimonio de la Sra. Marly Ferrer como testigo pericial (Ap. Dte. págs. 1186 a 1584). Dicha moción incluyó 21 páginas de argumentación, acompañada de 190 páginas de transcripción de la deposición a la señora Ferrer y 19 Exhibits adicionales. La “Moción solicitando que se excluya el testimonio de Marly Ferrer Montalvo” basó su oposición a que se admitiera el testimonio en cinco razones principales, cada una de las cuales se elaboro en sustancial detalle, haciendo referencia a las paginas de la deposición y de la evidencia documental en que se basa la objeción. A continuación indicamos los cinco aspectos y las páginas del memorando en que se discute ese aspecto.
1- Ni el nivel académico ni la experiencia o entrenamiento profesional de Marly Ferrer la cualifican como una perito historiadora. (Págs. 5 a 8; Véase Ap. Dte. págs. 1190-1193)
2- Sus opiniones no están sustentadas con evidencia o por una investigación confiable. (Págs. 8 a 14; Véase Ap. Dte. págs. 1193-1199)
3- La mínima investigación que Marly Ferrer llevó a cabo no siguió un método aceptable o razonable, especialmente tomando en cuenta toda la diversa y vasta información disponible para análisis. (Págs. 14 a 15; Véase Ap. Dte. págs. 1199-1200)
4- Dado que la investigación realizada por Marly Ferrer fue una informal y sus opiniones son especulativas, el testimonio de Marly Ferrer no es útil al Tribunal. (Págs. 15 a 20; Véase Ap. Dte. págs. 1200-1205)
5- El Tribunal Federal de apelaciones para el Primer Circuito determinó, en otro caso prácticamente idéntico al presente, que Marly Ferrer no estaba cualificada para ser perito historiadora y rechazó su informe como poco convincente, sin respaldo de evidencia, conclu[sorio] y basado en una evaluación incompleta. El informe presentado por Marly Ferrer en ese caso es casi idéntico al que preparó para este caso y el mismo está basado en la misma pobre “investigación” que realizó para apoyar sus opiniones. (Págs. 1 a 3; Véase Ap. Dte. Págs. 1186-1188). Véase, además, Prado Álvarez v. R.J. Reynolds Tobacco Co., 405 F.3d 36 (1er. Cir. 2005) (Ap. Reynolds págs. 5212-5220).
Cada uno de estos puntos fueron desarrollados en la moción en sustancial detalle, con referencias al curriculum vitae de la señora Marly Ferrer, el informe preparado por ésta, las deposiciones tomadas a la señora Ferrer y a otros deponentes y los otros Exhibits que acompañaron la moción.
Tres meses y medio más tarde, el 10 de febrero de 2006, los demandantes presentaron su oposición a la exclusión de la Sra. Marly Ferrer. Dicha oposición carece de argumentos o evidencia para refutar las cinco aseveraciones centrales de Reynolds, antes citadas. En vez de ello, los demandantes alegaron que no tenían que probar que el consumidor común desconocía los efectos adversos a la salud de los cigarrillos en el período de 1954 a 1969. Pero, en caso que el tribunal no aceptase dicho argumento y mantuviese que era necesario testimonio pericial para establecer que el consumidor común o típico desconocía que los cigarrillos eran detrimentales para la salud, los demandantes indicaron que presentarían como su perito a la Sra. Marly Ferrer. Adujeron que los argumentos de Reynolds en contra que se le aceptara como perito, sólo afectaban el peso a dársele a su testimonio, no su admisibilidad como testimonio pericial.
El argumento de los demandantes, al efecto que las objeciones de Reynolds sólo afectan al peso de la prueba, es contrario a las normas jurisprudenciales antes expuestas, por lo que rechazamos el mismo. Una vez la parte adversa objeta que se acepte a un perito propuesto, el tribunal viene llamado a atender dicho reclamo, utilizando aquellos *1227 criterios de confiabilidad que el tribunal considere apropiados, dada el área que cubrirá su opinión pericial. Al considerar si el testimonio pericial propuesto llena los criterios de confiabilidad, el tribunal debe considerar evidencia sobre entrenamiento, conocimiento y experiencia. Además, debe considerar las fuentes de información consideradas para formar su opinión pericial, tales como investigaciones específicas llevadas a cabo por el perito en preparación a su testimonio, fuentes consideradas confiables en el área de peritaje, tales como manuales de referencia y tratados reconocidos en el área y otras fuentes misceláneas. Finalmente, debe considerar el proceso mediante el cual el perito va de sus fuentes de información a sus conclusiones. Cualquier otro factor que en el sano juicio del tribunal ayude a establecer o impugnar la confiabilidad del testimonio puede ser considerado. Si lo considerase necesario, el tribunal puede celebrar una vista evidenciaría o argumentativa. Véase, entre otros: E. Chiesa, Tratado de Derecho Probatorio, supra, tomo 1, págs. 541 a 613; Daubert v. Merrell Dow Pharmaceuticals, Inc., supra; Kumho Tire Co. Ltd. et al. v. Carmichael et al., supra; In re: Air Crash Disaster at New Orleans, supra.
Una vez el tribunal de instancia ha formulado su determinación sobre si admitirá el testimonio del presunto perito, de quedar una de las partes inconformes con la determinación, ésta puede solicitar la revisión apelativa. El tribunal apelativo revisará la decisión del tribunal de instancia utilizando el criterio de abuso de discreción. E. Chiesa, Tratado de Derecho Probatorio, supra, pág. 565; Kumbo Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 152 (1999); General Electric Co. v. Joiner, 522 U.S. 136, 138-139 (1997).
La determinación de si el informe pericial y el propuesto testimonio de la Sra. Marly Ferrer poseen suficientes índices o características de confiabilidad es una difícil, dado el tipo de proposición que se trata probar con el mismo. Ello, ya que dicho testimonio se presentaría para probar un negativo, para probar que no existía conocimiento común de que el fumar cigarrillos era malo para la salud. Ello requería que se demostrara que el perito había hecho un estudio sustancialmente exhaustivo de todas las formas en que el usuario común adquiría información y/o formaba creencias durante el período de 1954 a 1969. No basta el haber examinado un universo limitado de fuentes de información, o un examen superficial de las fuentes, para concluir que el usuario común no conocía los efectos adversos a la salud del fumar cigarrillos. En comparación, la tarea del perito de Reynolds era mucho más fácil, pues una vez éste señalara una o varias fuentes que proveyesen tal información, su conclusión quedaba respaldada, sin necesidad de demostrar que su investigación fue exhaustiva o incluyó un examen profundo de las fuentes.
Ya que en el presente caso existían dos informes, el pasar juicio sobre si la investigación de la Señora Ferrer fue suficientemente exhaustiva y/o profunda se facilita. Ello, ya que se puede comparar el número y variedad de fuentes utilizadas por la Sra. Marly Ferrer con el número y variedad de fuentes utilizadas por el perito de Reynolds, Dr. Luis Martínez Fernández.
Antes de pasar a examinar si el tribunal abusó de su discreción al rehusar admitir como perito a la Señora Ferrer, es deseable considerar un aspecto poco usual del presente litigio. Según moción del 10 de noviembre de 2004 en el caso civil No. 03-1883(JAF) ante la Corte de Distrito Federal para el Distrito de Puerto Rico (Ap. Reynolds pág. 4853 a 4857) -presentada conjuntamente por la representante legal de los demandantes, Leda. Amarilis Arrocho Maldonado, y el ulead counsel” de Reynolds, Ledo. Salvador Antonetti Zequeira- a finales del año 2004 existían 12 demandas en que la licenciada Arrocho representaba a los demandados contra Reynolds, reclamando daños relacionados al haber fumado los cigarrillos que producía Reynolds. En otra moción, del 17 de noviembre de 2006, en el caso de autos (Ap. Reynolds, caso KLCE-2007-00178, pág. 86), Reynolds revisó el número de casos a dieciséis (16), e indicó que todos los casos ante el Tribunal de Distrito Federal llevados por la licenciada Arrocho habían sido desestimados.
Hemos examinado las resoluciones dispositivas en varios de estos casos, incluidas a las págs. 5212 a 5269 del Apéndice de Reynolds. De éstas se desprende que en los referidos casos se presentaban alegaciones similares a las del caso de autos, bajo la doctrina sobre responsabilidad absoluta extracontractual del fabricante de productos defectuosos. Los fumadores envueltos habían residido en Puerto Rico y fumado por períodos de *1228 tiempo similares a los del presente caso. Es razonable inferir, y un examen de las resoluciones dispositivas emitidas en varios de éstos demuestra, que los litigios se referían a hechos similares, ocurridos durante períodos de tiempo similares, en la misma área geográfica, por lo que los casos envuelven muchas de las mismas controversias de derecho y la evaluación de las controversias requiere aplicar los mismos estatutos y doctrinas legales que están presentes en el caso de autos.
Respecto a las calificaciones de la Sra. Marly Ferrer, su principal experiencia es como archivista, seguida por experiencia como maestra de escuela superior y guía turística. Las funciones del archivero y las del historiador están relacionadas, pero no son las mismas. El archivero identifica, protege y preserva los documentos de valor histórico y los cataloga o de otra forma los hace accesible a los usuarios. Los historiadores, por su parte, utilizan los documentos de uno o más archivos como una de las fuentes principales en su investigación histórica. Como expuso la Sra. Marly Ferrer: “Yo lo que hago es: organizo documentos antiguos, catalogo esos documentos, los describo y doy referencia ...”. (Pág. 15 deposición de 4 de junio de 2004; Ap. Dte. pág. 1,292). En relación a su preparación académica, ésta consiste de un bachillerato en historia del año 1995 y esfuerzos desde entonces para obtener una maestría en historia, los cuales estaban inconclusos a junio de 2004.
En general, la información pericial que los demandantes necesitarían probar para prevalecer en el presente caso (que el usuario común de Puerto Rico durante el período 1954 al 1969 no conocía ni tenía la expectativa de que el fumar cigarrillos afectaba adversamente la salud), constituiría un proyecto de investigación histórica de mayor envergadura que cualquiera que se desprende de la educación y experiencia de la señora Ferrer hasta el presente. A manera de ilustración de dicha conclusión, examinamos la sentencia en Valle Ortiz v. Reynolds, 385, Supp 2d 126 (2005), otra de las demandas de daños por el uso de cigarrillos que llevó la misma abogada de los demandantes en el presente caso, licenciada Arrocho. En ese caso, el perito de los demandantes fue el Dr. Luis E. Díaz Hernández, cuyas credenciales en término de educación y experiencia como historiador eran muy superiores a las de la señora Ferrer. Éste contestó a preguntas de los demandados sobre cuánto tiempo él estimaba que le tomaría a él preparar un informe para poder opinar sobre dicho tópico y contestó que le tomaría seis (6) meses a tiempo completo, asumiendo que contara con dos (2) ó tres (3) asistentes de investigación. (Ap. Dte. 1,534).
En nuestra opinión, la principal razón para excluir o rechazar a la señora Ferrer como perito surge de una lectura de su informe, denominado “Reporte del Experto” (Ap. Dte. págs. 1,688 a 1695). El informe dedica las primeras tres páginas a exponer su educación y experiencia. Luego presenta sus opiniones en término de generalidades sin relacionar las mismas a fuentes de información particular en las que se basa la conclusión. Esta falta de relacionar sus opiniones con las fuentes hace que no se pueda verificar si las conclusiones reflejan correctamente lo estudiado. El “Reporte del Experto”, tampoco demuestra un claro entendimiento de cuál es la tarea que tenía que realizar, a saber, determinar si existía o si no existía, conocimiento en el usuario común de los cigarrillos, para el período de 1954 al 1969, que el fumarlos afectaba adversamente la salud del fumador.
Respecto al entendimiento de la tarea, la cual requiere que se examinen esencialmente todas las posibles fuentes de información e índices de creencias, para poder aseverar que no existía conocimiento o expectativa de que el fumar era detrimental, el “Reporte del Experto” asevera tajantemente que no existía, pero al mismo tiempo refleja la aceptación que se requiere más investigación. 
Finalmente, del informe y de la deposición tampoco surge ningún reconocimiento de lo mucho que le quedaba por investigar, similar a la conclusión del otro perito utilizado por la ücenciada Arrocho, Luis E. Díaz Hernández, Ph. D.; quien a pesar de tener mucha más práctica o experiencia en investigación histórica que la señora Ferrer, previamente había estimado que le tomaría seis meses a tiempo completo, si tuviese dos ó tres asistentes de investigación. Lo anterior, según expuesto en más detalle en la “Moción solicitando se excluya el testimonio de Marly Ferrer Montalvo"' (Ap. Dte. págs. 1186 a 1206) y “Réplica a ‘Oposición a que se excluya *1229 el testimonio de Marly Ferrer1, presentada por la parte demandante”, nos lleva a concluir que la parte demandante no demostró que el testimonio que ofrecería la señora Ferrer sería testimonio confiable. Véase que los demandantes no trataron de refutar dichos argumentos, limitándose a argumentar que los mismos sólo afectan el peso a dársele al testimonio de la señora Ferrer.
Concluimos que no se excedió en su discreción el Tribunal de Primera Instancia al rechazar la solicitud de los demandantes para que se le permitiera testificar como perito.
VI
En el recurso de apelación, los demandantes argumentan que si el tribunal concluyó que la señora Ferrer no estaba calificada para testificar como perito, debió darle una oportunidad para que la parte demandante presentara a otro candidato. No tiene razón.
El 10 de julio de 2000 se presentó la demanda en el caso de autos. Cuatro años más tarde se había completado un amplio descubrimiento de prueba y el 12 de junio de 2004 Reynolds presentó una extensa y cuidadosamente fundamentada moción de sentencia sumaria. Las partes sometieron un total de trece (13) escritos adicionales de oposición, réplica, dúplica, etc., etc., relacionados a la solicitud de sentencia sumaria. La parte demandante conocía que Reynolds impugnaría las calificaciones de la señora Ferrer desde el 13 de octubre de 2004. (Véase pág. 22 de “Réplica a Oposición a Moción de Sentencia Sumaria ...”, Ap. Reynolds, pág. 4434). La Corte de Distrito Federal y el Primer Circuito de Apelaciones Federal habían rechazado a la señora Ferrer cuando ésta fue sometida como perito de los demandantes, para testificar sobre los mismos asuntos que nos conciernen en la presente demanda. Finalmente, el 13 de octubre de 2006, el tribunal de instancia emitió sentencia. En cuanto a las calificaciones de la señora Ferrer, el tribunal de instancia llegó a la misma conclusión que los tribunales federales, que ésta no estaba calificada como perito historiadora para testificar sobre la información y creencia de los usuarios comunes de Puerto Rico, para el período de 1954 a 1969, respecto a si el fumar cigarrillos era perjudicial para la salud. En esa etapa, la parte demandante solicitó que se le permitiera presentar otro candidato para testificar como perito. El tribunal rechazó dicha solicitud, lo cual claramente está dentro de su discreción. Lo solicitado es en extremo tardío, pues ya habían transcurrido seis años desde la presentación de la demanda y las partes tuvieron amplia oportunidad para argumentar los méritos de la solicitud de sentencia sumaria, peticionando la desestimación de la demanda. Acceder a lo solicitado conllevaría reabrir el descubrimiento de prueba, a los seis años de haberse presentado la demanda, y demorar la adjudicación del caso por uno o más años. No incidió al tribunal al rechazar dicha solicitud.
En resumen, luego de examinadas las causas de acción alegadas por la parte demandante, quedó claro que la decisión respecto si procedía desestimar la demanda en la etapa de sentencia sumaria dependía de si la parte demandante contaba con un perito que pudiese proveer testimonio confiable sobre si el usuario común de cigarrillos, en Puerto Rico, durante los años 1954 a 1969, creía que el fumar cigarrillos no tenía efectos adversos para la salud. La parte demandante no pudo producir un perito que ajuicio del tribunal fuese confiable y que hubiese estudiado dicho asunto en suficiente profundidad. La educación y la experiencia de la propuesta perito de la parte demandante, y más importante, la profundidad, extensión y metodología del propuesto informe., no le merecieron credibilidad para aceptarla como testigo pericial al tribunal de instancia, conclusión con la coincidimos a base de nuestro examen del expediente en apelación. No incurrió en abuso de discreción el tribunal al rechazar la persona propuesta como perito por la parte demandante.
Al concluir que la parte demandante no había demostrado que tuviese prueba para sostener su posición respecto el conocimiento común durante el período 1954 al 1969, procedía la desestimación de la demanda. No incidió el tribunal apelado al así hacerlo.
VII
En el recurso de Certiorari, cuyo número lo es KLCE-2007-00178, los demandantes recurren de la *1230 determinación del T.P.I. de aprobar el memorando de costas por la suma de $139,603.26. No tiene razón.
El memorando de costas presentado el día 30 de octubre de 2006, el cual fue juramentado por el Ledo. Antonetti Zequeira indica que, por razón desconocida, la sentencia del caso fue recibida a los siete (7) días de su notificación. Por ello, utilizó para el memorando los balances que reflejaban los récords de contabilidad del bufete, pues no se había podido localizar toda la evidencia documental en tan corto plazo. Indicó que remitirían la evidencia documental para respaldar lo reclamado, tan pronto localicen y reconcilien la misma con el memorando de costas. El memo de costas de 30 de octubre de 2006 totalizaba $182,769.70. Los demandantes objetaron las costas solicitadas.
Reynolds presentó un memorando de costas enmendado, acompañando copias de toda la evidencia documental para respaldar su solicitud de costas. El balance reclamado se redujo a $146,232.66. El 2 de enero de 2007, el tribunal emitió resolución aprobando el memorando, luego de eliminar por completo una de las partidas reclamadas y reducir otra, quedando aprobado un total de $139,603.26.
En la discusión del recurso, los demandantes peticionarios se limitan a la partida de los gastos de peritaje de: Dr. Luis Martínez Fernández, Ph.D. (historiador), Dr. Moas, Dr. Malaret, Dr. Kaplan, y Dr. Alberto Varela (psiquiatra). Alegan, en esencia que dichos peritos han trabajado en varias demandas en que la licenciada Arocho ha representado a demandantes contra Reynolds, en casos por daños relacionados a fumar cigarrillos, por lo que se le están cargando al presente caso, del Sr. Torres Rivera, facturación perteneciente a los otros casos. La parte demandante no particulariza las facturas a cuales aplica su reclamo.
El costo del informe del Dr. Martínez Fernández fue distribuido entre los casos en que éste ha participado como perito historiador, por lo que Reynolds sólo reclamó $8,780.78 en el presente caso. Examinado el extenso y muy bien fundamentado informe preparado por éste, es evidente que la suma incluida en el presente caso es sólo una pequeña fracción de lo facturado por dicho perito. Al examinar la facturación de los otros peritos, se desprende claramente que la facturación se refiere exclusivamente al trabajo hecho por éstos en el presente caso. De los otros peritos, la mayor cantidad fue pagada al Dr. Alberto Varela, psiquiatra con particular experiencia en el área de adicción, dependencia a substancias químicas y asuntos relacionados. Debido a la forma en que se desarrolló el caso, durante las etapas intermedias del mismo adquirió particular prominencia el reclamo de la parte demandante que el Sr. Torres Rivera era adicto a la nicotina. Por tal razón, el tribunal ordenó a las partes presentar escritos en respaldo de su posición al respecto. Ello requirió que el doctor Varela tuviera que revisar todas las deposiciones para poder formar su juicio pericial sobre si dicho reclamo era médicamente válido en el presente caso. En cumplimiento con lo ordenado por el tribunal, Reynolds presentó un memorando de derecho de veintidós (21) páginas sobre dicho asunto, el cual refleja el análisis del doctor Varela. Además, el doctor Varela preparó una extensa declaración jurada examinando en detalle la alegación de la parte demandante que el Sr. Torres Rivera era adicto a la nicotina. Concluimos que lo reclamado como costas relacionadas a testimonio pericial está sustentado por una facturación clara al efecto de que se refiere a las tareas relacionadas al presente litigio y que las cantidades en parte reflejan el costo sustancial que conllevó el reclamo de adicción por la parte demandante. Resolvemos que del recurso no se desprende evidencia alguna de abuso de discreción por el tribunal, por lo que no procede alterar las costas aprobadas por el tribunal. En consecuencia, tampoco procede expedir el auto de certiorari solicitado.
VIII
Por las consideraciones antes expuestas, en el recurso KLAN-2006-01505, se confirma la sentencia del Tribunal de Primera Instancia en el caso KDP2000-1254; y se deniega la expedición del auto de certiorari en el recurso KLCE-2007-00178.
Lo acordó y manda el Tribunal y lo certifica la Secretaria del Tribunal
*1231 María Elena Pérez Ortiz
Secretaria del Tribunal de Apelaciones
ESCOLIOS 2007 DTA 66
1.El neumólogo que atendía al Sr. Francisco Torres, estimó que su consumo era de hasta “cuatro cajetillas, promedio, diarias” (Ap. Dte. Pág. 1741)’ por lo que consideramos razonable un estimado de tres y media cajetillas, en promedio, la mayor parte de su vida adulta.
2.Aunque el escrito de apelación no lo aclara, la parte demandante había renunciado a todas las causas de acción heredadas, o sea las presentadas a nombre del causante, desde su “Oposición a Sentencia Sumaria del 1ro de septiembre de 2004, págs. 7 y 23 de esa Oposición (Ap. Dte. págs. 282, 298).
3.El índice del apéndice de la parte apelante indica que éste consiste de 3,793 páginas, pero el apéndice presentado consiste de sólo 2,748 páginas.
4.El alegato menciona dolo contractual. Dicha causa requiere una relación contractual entre las partes y no surge que exista dicha relación contractual directa entre el manufacturero y los apelantes, especialmente considerando que los apelantes renunciaron a todas las causas de acción heredadas, o sea, aquellas causas donde el derecho a recibir compensación era del causante, Sr. Torres Rivera, y los apelantes heredaban dicho derecho al morir el causante.
5.Hemos incluidos las notas al calce relacionadas a la parte citada de la opiniones, ya que en las mismas se exponen ciertos aspectos importantes de la doctrina. La primera de estas notas al calce es como sigue:
“Para llenar una laguna de nuestro ordenamiento jurídico, adoptamos por vía jurisprudencial, los principios legales elaborados en el derecho común norteamericano de "products liability". Mendoza v. Cervecería Corona, ante. Nuestra tarea a través de los años se ha circunscrito a desarrollar esta área del derecho caso a caso, no obstante el hecho, de que nuestro derecho patrio está arraigado al sistema del Derecho Civil donde predomina la norma positiva o escrita. Por tal razón, entendemos que es menester de la Asamblea Legislativa recopilar, incorporar, adoptar, desarrollar un derecho propio de "products liability". En Francia, por ejemplo, se está tratando de enmendar el Código Civil Francés, para incorporar las normas generales que rigen el campo de la responsabilidad absoluta del fabricante de productos defectuosos. Sin embargo, mientras la Legislatura no actúe, seguiremos desarrollando dicho campo caso a caso. ”
6.Cabe señalar que estos dos (2) requisitos quedan comprendidos entre los pautados por nuestro Artículo 1802 del Código Civil, 31 L.P.R.A. see. 5141. En España se ha reconocido que la responsabilidad civil del fabricante podrá albergarse siempre en los términos generales de este articulado. Ángel Rojo y Fernández-Río, La Responsabilidad Civil del Fabricante, Zaragoza, Cometa, 1974, pág. 125. Se observa que por razones de política pública la teoría de responsabilidad absoluta del fabricante omite el requisito de establecer la negligencia del demandado.
7.El defecto de que adolece el producto no tiene que ser uno irrazonablemente peligroso al consumidor o comprador como dispone la Sec. 402A (1966) del Restatement (Second) of Torts. Montero Saldaña v. Amer. Motors Corp., 107 D.P.R. 452, 461 (1978). En dicho caso, nos basamos en la decisión del Tribunal Supremo de California en Cronin v. J.B.E. Olson Corporation, 501 P.2d 1153 (Cal. 1972), y Barker v. Lull Engineering Co., Inc., 573 P.2d 443 (Cal. 1978), los cuales rechazaron "el concepto de la ‘condición irrazonablemente peligrosa al consumidor’ consignada en el Restatement, [ya que] para aplicar la doctrina de responsabilidad absoluta basta ajustarse a lo expuesto en el caso de Greenman antes transcrito, ya que provee ‘una prueba clara y sencilla para determinar si el demandante lesionado tiene derecho a un resarcimiento’". (Énfasis en el original suprimido) Montero Saldaña, ante, pág. 462.
8.A esos efectos expresó el Tribunal a la pág. 454:
"In general, a manufacturing or production defect is readily identifiable because a defective product is one that differs from the manufacturer's intended result or from other ostensibly identical units of the same product line. For example, when a product comes off the assembly line in a substandard condition it has incurred a manufacturing defect. (E. g., Lewis v. American Hoist & Derrick Co. (1971) 20 Cal.App.3d 570, 580, 97 Cal. Reptr. 798.) A design defect, by contrast, cannot be identified simply by comparing the injury-producing product with the manufacturer's plans or with other units of *1232 the same product line, since by definition the plans and all such units will reflect the same design. Rather than applying any sort of deviation-from-the-norm test in determining whether a product is defective in design for strict liability purposes, our cases have employed two alternative criteria in ascertaining, in Justice Traynor's words, whether there is something 'wrong, if not in the manufacturer's manner of production, at least in his product'. ” (Traynor, The Ways and Meanings of Defective Products and Strict Liability, supra, 32 Tenn. L. Rev. 363, 366)"
9. La regla del caso Barker v. Lull Engineering Co., Inc., supra, combina parte del "consumer expectation test" y del "risk/ utility or benefits test". Véase: W.P. Keeton, Prosser and Keaton on Torts, 5ta. ed., Minnesota, Ed. West Publishing Co., 1964, pág. 702; M. Stuart Madden, Products Liability, 2da ed., St. Paul, Minn., West Publishing Co., 1988 Vol I pág 220. ’ e e'
10. En Barker v. Lull Engineering Co., Inc., supra, a la pág. 455, el Tribunal Supremo de California expresó así la norma:

...a product is defective in design either: (1) if the product has failed to perform as safely as an ordinary consumer would expect when used in an intended or reasonably foreseeable manner, or (2) if, in light of the relevant factors discussed below, the benefits of the challenged design do not outweigh the risk of danger inherent in such design".

Entre los criterios relevantes a considerar en la segunda alternativa se señalaron los siguientes:
... the gravity of the danger posed by the challenged design, the likelihood that such danger would occur, the mechanical feasibility of a safer design, the financial cost of an improved design, and the adverse consequences to the product and to the consumer that would result from an alternative design. ” Barker v. Lull Engineering Co., Inc., ante, pág.
11. Nuestro Tribunal acogió la doctrina de que todos los que intervienen en la cadena de fabricación y distribución responden solidariamente con el fabricante ante el peijudicado. Montero Saldaña v. American Motors, Corp., 107 D.P.R 452 (1978); Ferrer v. General Motors Corp., 100 D.P.R. 246 (1971). Véase al respecto H. Brau del Toro, Los daños y perjuicios extracontractuales en Puerto Rico, San Juan, Publicaciones J.T.S., 1986, Vol. II, Cap. XVI, pág. 906.
12. En su alegato, Sears solicitó que reconsideráramos la norma de responsabilidad absoluta en los casos de advertencias o instrucciones insuficientes, de manera que sea de aplicación el criterio de negligencia del fabricante o vendedor. No procede su petición. En Rivera et al. v. Superior Pkg., Inc. et al., 132 D.P.R. 115, 125 esc.4 (1992), señalamos que la doctrina de responsabilidad absoluta del fabricante fue adoptada por vía jurisprudencial para llenar una laguna de nuestro ordenamiento; que hemos desarrollado dicha doctrina caso a caso; y que sería deseable que nuestra Asamblea Legislativa recopile, incorpore, adopte y desarrolle un derecho propio en el campo de la responsabilidad del fabricante. Además, destacamos que por razones de política pública la teoría de responsabilidad absoluta omite el requisito de la negligencia del demandado. Estamos conscientes de que existen diversas posiciones al respecto. Sin embargo, hasta que el legislador no se exprese, mantendremos esta norma, ya que la misma ofrece mayor protección al consumidor. A su vez, en nuestro ordenamiento, el demandado no está desprovisto de protección, ya que también acogimos el concepto de “graduación de culpa” en los casos de responsabilidad absoluta del fabricante o vendedor. Montero Saldaña v. Amer Motors Corp 107 D P.R. 452,463-465 (1978).
13. Esto se refiere a cuando un producto falla en igualar la calidad promedio de productos similares, por lo que el fabricante responde por los daños resultantes de las desviaciones de la norma. Rivera et al. v. Superior Pkg., Inc. et al., 132 D.P.R. 115, 125-126 (1992); Montero Saldaña v. Amer. Motors Corp., 107 D.P.R. 452, 512 (1978).
14. Esto se refiere a cuando un producto falla en comportarse en forma tan segura como un usuario ordinario esperaría al usar el producto para el uso para el cual es destinado o para el cual previsiblemente podría ser usado, o cuando el diseño del producto es la causa próxima de los daños y la parte demandada no demuestra que en el balance de intereses los beneficios del diseño en cuestión sobrepasan los riesgos de peligro inherentes en el diseño. Rivera et al. v. Superior Pkg., Inc. et al., supra.
15. Las advertencias informan al consumidor o usuario de un producto sobre los peligros del mismo. Las instrucciones describen el procedimiento que debe seguirse para utilizar un producto de forma efectiva y segura. Las advertencias pueden ser adecuadas mientras que las instrucciones pueden ser deficientes o viceversa. 3 American Law of Prod. Liab. 3d, Sec. *1233 32:20, (1993).
16. Sobre el problema del idioma en las advertencias y/o instrucciones de los productos, véanse: L.M. Baldwin, Ramírez v. Plough, Inc.: Should Manufacturers of Nonprescription Drugs Have a Duty to Warn in Spanish?, 29 U. S. F. L. R. 837 (1995); T.H. Lee, A Purposeful Approach to Products Liability Warnings and Non-English-Speaking Consumers, 47 Vand. L. Rev. 1107 (1994); R. Geoffrey Dillard, Multilingual Warning Labels: Product Liability, "Official English," and Consumer Safety, 29 Ga. L. Rev. 197 (1994). C.S. Maciejewski, The Dilemma Over Foreign Language Labeling of Over-the-counter Drugs, 15 J. Legal Medicine, 129-154 (1994); G. Sargeant, Drug Company Disputes Need for Warnings in Spanish, 29 (Núm. 8) Trial 91 (1993); S.B. Goldberg, Product Liability; Should Warnings be Bilingual, 79 A.B.A. L, 83 (1993).
17. Véanse, por ejemplo: East Penn Mfg. Co. v. Pineda, 578 A. 2d 1113 (1990); Rhodes v. Interstate Battery System of America, 722 F.2d 1517 (11mo. Cir. 1984).
18. En la nota al calce número 9 de Rivera et al. v. Superior Packaging et al., supra, citando a Barker, supra, el Tribunal Supremo indicó como factores a considerarse los siguientes: "the quantity of the danger posed by the challenged design, the likelihood that such danger would occur, the mechanical feasibility of a safer alternative design the financial cost of an improved design, and the adverse consequences to the product and to the consumer that would result from an alternative design".
19. En el caso de autos, la parte demandante argumenta en el escrito de apelación que “[L]a declaración jurada del Dr. Félix Iván León y la deposición jurada del Dr. Francisco J. Parga trasladan el peso de la prueba al fabricante bajo el análisis o ‘test’ de riesgo utilidad bajo la doctrina de defecto de diseño". Dichos facultativos médicos podrían testificar como peritos sobre el daño que el fumar cigarrillos causa a los órganos del fumador, pero no se presentó ninguna evidencia que posean peritaje en el diseño de cigarrillos. Sus declaraciones tampoco se refieren a aspectos del diseño de los cigarrillos Winston que conviertan a éstos en menos seguros (mas dañinos), que otos diseños alternos.
20. Aunque un análisis de los cambios introducidos por la Ley de 1969 nos lleva a concluir que respecto las advertencias en las cajetillas de cigarrillos el campo quedó ocupado desde el año 1965, para propósitos del análisis hace muy poca diferencia si la fecha es 1965 ó 1969, por lo que utilizaremos la interpretación que más favorece a la parte demandante, o sea, utilizaremos la fecha de 1969.
21. El período respecto advertencias inadecuadas se limitaría all años si se interpreta que, en cuanto las cajetillas de cigarrillos concierne, la preclusion comenzó en el año 1965.
22. Véase además, la nota al calce número 7 de la opinión en Cruz Vargas v. R.J. Reynolds Tobacco Co., 348 F.3d 271 (1st. Cir. 2003), en la cual el Tribunal expone su fundamento para la conclusión respecto la naturaleza objetiva de una determinación sobre conocimiento común, exponiendo como sigue:

“7. Courts construing Section 402A of the Restatement (Second) of Torts, which is applicable here, have found the determination of common knowledge to be purely objective. See e.g. McLennan v. American Eurocopter Corp., 245 F.3d 403, 428 (5th Cir. 2001) ("Whether information about a risk is common knowledge is an objective inquiry and the user's knowledge is not dispositive on the issue."); Insolia v. Philip Morris, Inc., 216 F.3d 596, 599 (7th Cir. 2000) (section 402A involves an objective test "and is not dependent upon the knowledge of the particular injured consumer"); Little, 243 F. Supp. 2d at 492 (D.S. C. 2001)("[Plaintiff’s] knowledge or lack of knowledge concerning the dangers of cigarettes is irrelevant for purposes of this analysis."). ”

23. Nuestras Reglas de Evidencia en el área de testimonio pericial siguen de cerca las Reglas Federales, por lo que las interpretaciones de las correspondientes Reglas Federales de Evidencia por el Tribunal Supremo Federal y los Tribunales de Circuito Federal son altamente persuasivas.
24. “[Tjhe trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable. ” Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 589 (1993).
25. Luego de la “Oposición a que se Excluya ...” fueron presentadas tres mociones adicionales, (Ap. Dte. págs. 1646-1664, *1234 págs. 1697-1699 y págs. 1680-1680), las cuales no incluyen significativos argumentos adicionales.
26. El Dr. Díaz Hernández, Ph.D., es profesor de historia a nivel universitario.
27. En adición al Reporte del Experto , véanse las páginas 1,306 a 1,313 del apéndice de la parte demandante.